**Martha NEMTIN, Plaintiff,**

v.

**David R. ZARIN, Defendant.**

**Civ. 81–3004.**

United States District Court, D. New Jersey.

Sept. 7, 1983.

Martha Nemtin, pro se.

Cooper, Perskie, April, Niedelman, Wagenheim & Weiss by James L. Cooper, Atlantic City, N.J., for plaintiff.

Stein, Bliablias, McGuire & Pantages by Dino Bliablias, Newark, N.J., for defendant.

## OPINION

BIUNNO, Senior District Judge.

This suit is nominally one to recover on certain promissory notes, security agreements, checks issued by a borrower to a lender to repay loans (some of those checks having been presented for payment and dishonored, and others of which have not been presented), and related instruments.

The complaint was filed in this court, alleging jurisdiction under 28 U.S.C. § 1332(a), with plaintiff a citizen of Canada and defendant a citizen of New Jersey. The amount in controversy is said to exceed $10,000., and there is no doubt that it does.

Defendant has moved for partial summary judgment on all counts, asserting grounds for non-liability (thus making the judgment sought "partial"), and plaintiff has filed a cross-motion.

The amended complaint is in eleven counts, each based upon a note or other instrument in a series between the parties, though not chronologically arranged. The last count, dealing with what appears to be the earliest note was added when the complaint was amended because, as the court understands it, defendant had been paying interest on that note when suit was filed and it was not then regarded as being in default. Interest payments stopped after suit was filed, and the complaint was amended (actually supplemented) to assert the added item.

The major focus of the issue presented by the motion arises out of the nature and application of the law of New Jersey to the transactions and instruments giving rise to the suit. Put very briefly, defendant was evidently engaged over a period of time in rather steady and increasingly heavy gambling at legalized casinos in Atlantic City, and accepted loans in various forms from the plaintiff in part to maintain his credit standing at the casinos so he could continue gambling, and in part to use her own credit at the casinos to get chips for gambling.

Needless to say, the usual operation of the law of large numbers coupled with payoff odds lower than the mathematical probabilities, eventually led to losses in millions of dollars and an inability to repay the plaintiff.

It is indicated that a Superior Court suit was begun by the major casino involved against both the parties to this suit. Defendant here seems to have negotiated some kind of settlement arrangement based on an installment arrangement secured by such collateral he could provide. The settlement was to have disposed of the casino's claim against plaintiff as well, it is indicated that plaintiff here did not approve the proposal, possibly seeking better terms, and that suit continues against her there.

The question whether her claims asserted here should have been advanced as mandatory cross-claims in the Superior Court

suit brought by the casino, under the principle of New Jersey's "single controversy" rule has not been raised or considered at this stage, and it is merely noted at this time.

In order to grasp the legal aspect of the issue now before the court, it is necessary to have a clear understanding of the historical and legal development of New Jersey law in respect to gambling. Because the jurisdictional basis is diversity of citizenship, this court sits as though it were the Superior Court of New Jersey as to law other than procedure, under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

*The Constitutional History.*

New Jersey's first Constitution was adopted at Burlington on July 2, 1776, the same day that the Congress of the original colonies, assembled at Philadelphia, adopted a resolution declaring that the colonies were free and independent States. It remained in effect until September 2, 1844 when a new constitution replaced it after being agreed upon by delegates of the people in convention in Trenton and ratified by the people at an election held August 13, 1844. See *N.J. Const., 1844* Art. VIII, sec. 4 for effective date.

Under the 1776 Constitution the authority to introduce and pass bills was placed in a legislative council (one member from each county, plus the Governor, who presided) and a general assembly (three members from each county, subject to adjustment by a majority of the representatives of both bodies on the principles of more equal representation). There were no significant limitations on the legislative power. The main exception was that the legislative council was not to prepare or alter any money bill. See, *N.J. Const.1776*, Art. I, III, V and VI.

The laws published not long before by Mr. Allinson were to remain in full force (except as incompatible with the constitution) until altered by the legislature. *N.J. Const. 1776*, Art. XXI.

The common law of England, and so much of its statutes as had been practiced, was continued in force (except those parts repugnant to rights and privileges in the Constitution) until altered by future law of the legislature. *N.J. Const. 1776*, Art. XXII.

There is nothing in that first Constitution about gambling, or about laws on gambling.

New Jersey's second Constitution of 1844, like the 1776 charter, also provided that the common law and statute law then in force and not repugnant to the Constitution, were to remain in force until altered or repealed by the legislature. *N.J. Const. 1844*, Art. X, par. 1.

It did contain a provision on lotteries. That provision simply read, (Art. IV, sec. VII, par. 2):

"No lottery shall be authorized by this State; and no ticket in any lottery not authorized by a law of this state shall be bought or sold within the State".

By amendment approved September 28, 1897 and proclaimed October 26, 1897, this same provision was altered to read:

"No lottery shall be authorized by the legislature or otherwise in this State, and no ticket in any lottery shall be brought or sold within this State, nor shall pool-selling, book-making or gambling of any kind be authorized or allowed within this State, nor shall any gambling device, practice or game of chance now prohibited by law be legalized, or the remedy, penalty or punishment now provided therefor be in any way diminished."

The provision remained unchanged until amended, at the special election of June 20, 1939, proclamation of July 11, 1939, to legalize horse race meetings and pari-mutuel betting thereon, subject to restrictions in the amendment. This change was integrated with what was there, and which was strengthened in some respects while modified to accomodate the legalized activity. The text as amended read:

**2. Horse race meeting; pari mutuel betting; lotteries, roulette or games of chance; pool-selling, book-making or gambling**

It shall be lawful to hold, carry on, and operate in this State race meetings whereat the trotting, running or steeplechase racing of horses only may be conducted between the hours of sunrise and sunset on week days only and in duly legalized race tracks, at which the pari-mutuel system of betting shall be permitted. No lottery, roulette, or game of chance of any form shall be authorized by the Legislature in this State, and no ticket in any lottery shall be bought or sold within this State, or offered for sale; nor shall pool-selling, book-making, or gambling of any kind be authorized or allowed within this State, except pari-mutuel betting on the results of the racing of horses only, from which the State shall derive a reasonable revenue for the support of government; nor shall any gambling device, practice, or game of chance, or pari-mutuel betting thereon now prohibited by law, except as herein stated and otherwise provided, be legalized, or the remedy, penalty, or punishment now provided therefor be in any way diminished.

The present Constitution, adopted in 1947, replaced the last quoted provision, which combined the 1844 text, the 1897 amendment to strengthen it, and the 1939 amendment to relax it for pari-mutuel betting on horse races, with a much simpler text:

**2. Gambling**

2. No gambling of any kind shall be authorized by the Legislature unless the specific kind, restrictions and control thereof have been heretofore submitted to, and authorized by a majority of the votes cast by, the people at a special election or shall hereafter be submitted to, and authorized by a majority of the votes cast thereon by, the legally qualified voters of the State voting at a general election.

This language did two things. First, the reference to gambling "heretofore" submitted to and approved by the people at a "special election" draws in the legalization of pari-mutuel betting at legally authorized race tracks accomplished in 1939 since that is the only instance of legalization by referendum at a special election. Second, and for the future, it enabled the people by referendum (but only at a general election) to permit the Legislature to authorize other kinds of gambling so long as the specific kind, and the restrictions and control thereof are approved by the referendum.

However, since amendments to the Constitution may be made under Art. IX, it remains possible to legalize one or another kind of gambling by amending the Constitution (also by referendum at a general election) as well.

The history since 1947 displays that both modes have been used, with the direct amendment to the Constitution being used in 1953 (for charity bingo and raffles), in 1972 (for a State lottery), and in 1976 and 1981 (for casino gambling in Atlantic City and for an amendment thereto). See *N.J. Const., 1947*, Art. IV, sec. VII, par. 2, as amended.

The referendum method (without amending the Constitution) was used in 1959 (for amusement games at particular kinds of location), and in 1961 (to extend amusement games to agricultural fairs and exhibitions). See, N.J.P.L. 1959, c. 109; N.J.P.L. 1961, c. 103; N.J.S.A. 5:8–100 et seq.; N.J.S.A. 5:8–121, et seq.

There are obvious differences between the two modes of legalization, and some of these appear by inspection of the language used. A number of amendments directly legalize a particular kind of gambling, with one or more constitutionally required criteria or conditions. This was true of the 1939 amendment to the 1844 Constitution ("*It shall be lawful* to hold * * * race meetings whereat the * * * racing of horses only may be conducted * * * in duly legalized race tracks, at which the pari-mutuel system of betting shall be permitted * * * from which the State shall derive a reasonable revenue for the support of government.") (emphasis added)

It was true of the amendment for charity bingo, in 1953 ("*It shall be lawful* for bona fide [organizations] to conduct * * * games

of chance of * * * bingo or lotto * * * when the entire net proceeds * * * are to be devoted to [specified] uses * * * ")

It was not true of the amendment of 1953 (approved at the same time as the bingo amendment) for raffles, or the 1972 amendment for a State lottery operation, or of the 1976 amendment for casino gambling in Atlantic City. In these 3 instances, the language of the amendment does not itself make lawful the particular kind of gambling. Instead, each says that "it shall be lawful *for the Legislature to authorize*" by law, one of the other kinds of gambling. (emphasis added)

To those not familiar with the complex of local forces within the State, these differences may seem odd. Why amend the Constitution by referendum merely to authorize the Legislature to legalize a particular kind of gambling, with its restrictions and control, when the same end can be reached by statute approved by referendum?

The answer is that in a particular situation, it may be desirable to specify major restrictions and controls in the Constitution itself to minimize the risk of opposition by voters who lack confidence that the Legislature will refrain from lowering the bars. Or, it may be thought desirable to provide a Constitutional guarantee to bar a particular kind of gambling in a given municipality unless approved by its own voters on referendum. This protection can avoid loss of the proposition by opponents who do not care if other localities are willing to accept the activity, but do not want it at home. Another reason may be that the proponents wish to have a form of gambling with essentially no restrictions and control (as for the State lottery). Still another may be to require the application of proceeds to specific purposes and ends by Constitutional mandate, to either gain support or weaken opposition. These and other like reasons are rather evident from a reading of the text of each amendment.

In sum, so far as the N.J. Constitution is concerned, the only lawful forms of gambling are:

... pari-mutuel betting at horse race meetings at legalized race tracks, preserved as from the 1939 amendment.

... bingo and raffles by qualified organizations under the 1953 amendments (and a later change to include senior citizen organizations).

... amusement games in seashore communities and other resorts, by the 1959 referendum (and extended to agricultural fairs and exhibitions in 1961).

... the State lottery, by the 1969 amendment.

... casino gambling in Atlantic City, by the 1972 amendment (and changes made in 1976 and 1981).

No other kind of gambling has been authorized by the Legislature.

*The Statutory History*

The entire statutory history need not be catalogued here, as there are items involving details whose treatment would obscure the major line of development.

The New Jersey courts recognize that under the common law of England and of the colony or province of New Jersey, wagering and gambling contracts were upheld.

The Act for suppressing of lotteries of 1797, revised in 1846, denounced lotteries as common and public nuisances, and set out both criminal and civil consequences.

It has been observed that lotteries were used as a means of raising funds for the then "College of New Jersey", (now Princeton University). Church trustees were authorized to conduct lotteries to build edifices, and Newark Academy seems to have been financed in this way. See, *Dombrowski v. State*, 111 N.J.L. 546, 168 A. 722 (Sup.1933).

In the period before the 1844 Constitution, with its prohibition against the authorization of "lotteries", the Legislature was obviously free to prohibit lotteries, or other forms of gambling as well, as a general matter, and yet authorize particular lotteries when it chose to.

The 1844 Constitution forbade the operation of "lotteries", as well as the purchase

or sale of any "ticket" in a lottery, but the amendment of 1897 went much further, adding prohibitions against gambling of any kind, or the legalization of any gambling device, practice or game of chance, or the diminution of any remedy, penalty or punishment then provided by law.

There were several streams of statutes dealing with the subject as a whole, and with periodic statutory revisions or complications they were sometimes cut apart and reorganized.

For example, section 1 of the Act to prevent gaming, passed February 8, 1797, made it an indictable offense to play for money, goods, chattels or other valuable thing at any of the games there listed. Virtually unchanged, that section became R.S. 2:135–1 of the 1937 Revised Statutes, and N.J.S. 2A:112–1 of the Title 2A Revision of 1951. In the final report of the N.J. Criminal Law Revision Commission (1971), it appeared virtually unchanged as Draft 2C:37–1(a), with the Commissioners' Note thereto that the gambling laws should remain unaltered by the Commission, and should be the subject of individual study and revision, citing recommendations to that effect submitted January 20, 1970 by Hon. Frederick B. Lacey, then U.S. Attorney for this District.

As eventually enacted by N.J.P.L. 1978, c. 95 and amended thereafter, the criminal statutes on gambling were revised and re-written, see N.J.S. 2C:37–1 through 9, including a section that nothing in chapter 37 was to be construed to prohibit any activity authorized by the "Casino Control Act", N.J.S.A. 5:12–1, et seq., or to supercede any provision of that Act. Nothing else in Title 2C deals with other forms of authorized gambling such as pari-mutuel horse racing, bingo, raffles, amusement games or the State lotteries.

However, section 2 of the same 1797 Act, which rendered "utterly void and of no effect" all promises, agreements, notes, bills, bonds, contracts, judgments, mortgages or other securities or conveyances made by any person, "the whole or any part of the consideration" of which is money, etc., won, laid or bet at illegal games, "or for reimbursing or repaying any money knowingly lent and advanced" for that kind of purpose, has remained virtually unaltered and is now in force as N.J.S.A. 2A:40–3.

Thus, the collection of laws at first written in combination have divided over the many years into one group having to do with crimes, and the other with the civil aspects of illegality.

As originally enacted, the second section of the Act to prevent gaming of 1797 stood on its own (though read in pari materia with the Act as a whole), without cross-reference to any other section.

By the time of the Revision of 1877, as referred to in *Flagg v. Baldwin*, 38 N.J.Eq. 219 (E & A 1884), the first section of the Act to prevent gaming made unlawful (but not criminal) all wagers on any contingent event, and the third section was the continuation of what had been the second section of the 1797 Act, namely making utterly void all promises and instruments made where any part of the consideration was for money bet in violation of the first section, or to repay money knowingly advanced to help or facilitate that violation. This pattern has continued unchanged since then. The first section, declaring gambling unlawful (without addressing criminal aspects) became N.J.Comp.Stat. 1910, p. 2623, § 1, then N.J.R.S. 2:57–1 (1937), and finally N.J.S. 2A:40–1, the present statute.

Similarly, the third section became N.J. Comp.Stat.1910, p. 2624, § 3, then N.J.R.S. 2:57–3 (1937), and finally N.J.S. 2A:40–3, the present statute.

To the extent that what is now N.J.S. 2A:40–1 makes gambling of any kind unlawful, it is superseded by the 1939 Constitutional Amendment, which is paramount law that itself declares that "it shall be lawful" to conduct horse race meetings "in duly legalized race tracks, at which the pari-mutuel system of betting shall be permitted."

The same is true of charity bingo and raffles, under the 1953 amendments to the

Constitution. While the bingo amendment provides that it "shall be lawful" to conduct and play bingo under the specified conditions, and the raffles amendment merely authorized legalization by the Legislature of the conduct of raffles under the specified conditions, the enabling statutes for both types of gambling declare that "it shall be lawful" to carry on the activity contemplated. See N.J.S.A. 5:8–25 for bingo, and N.J.S.A. 5:8–51 for raffles.

This pattern was continued in the Amusement Games Licensing Law, approved on referendum without amending the Constitution, also using the term "it shall be lawful" in connection with the issuance of licenses, operation of the games by licensees and participation by players, N.J.R.S. 5:8–101. This statute, possibly because it was grounded on referendum approval rather than constitutional amendment, also expressly exempted the activities it legalized from the *criminal* statutes otherwise applicable, N.J.S. 5:8–110. It also made explicit that what it legalized did not extend to bingo or raffles (with one small exception), N.J.S. 5:8–112, and also made explicit that it did not authorize otherwise illegal gambling (largely using the language of the criminal statutes) or betting on horses, on or off-track, N.J.S. 5:8–113.

The next enactment was the State Lottery Law, N.J.S. 5:9–1, authorized by the 1969 referendum. Unlike any of the earlier legalizing laws on gambling, it seems not to contain any "it shall be lawful" expression. At the most, it says that no other law providing any penalty or disability for the sale of "lottery tickets", or any act done in connection with a lottery, is to apply to the sale of tickets or shares performed pursuant to the act, N.J.S. 5:9–19.

The final statute in the series is the Casino Control Act N.J.S.A. 5:12–1, et seq., to legalize casino gambling in Atlantic City under the authority of the constitutional amendment.

As with the State Lottery Law, the Casino Control Act contains no expression that can be found that declares, as did the earlier series of Acts, that "it shall be lawful" to engage in the regulated activity. The only statement of this kind is found as N.J.S.A. 5:12–124, which reads in full:

"The provisions of N.J.S. 2A:40–1, 2A:112–1 and 2A:112–2, shall not apply to any person who, as a licensee operating pursuant to the provisions of this act, or as a player in any game authorized pursuant to this act, engages in gaming as authorized herein."

Other provisions of a kind not found in the enabling legislation for pari-mutuel betting at race tracks, or for bingo, raffles, amusement games or the State lottery, deal with the allowance of credit by a licensed casino to a player under quite strict regulations, N.J.S.A. 5:12–101.

Without repeating the full text here, the format of the section is to forbid extensions of credit (including the acceptance of checks or making of loans) from players except under the quite strict regulations and control spelled out in that section. The major constraints are:

... all checks must be dated, but not postdated

... the check must be payable to the casino licensee

... the check may only be presented to designated persons

... the check (if not earlier redeemed) must be deposited for collection through a bank within a specified time from its date (depending on its size)

... the checks may not be transferred to anyone other than (1) the drawer; (2) a bank for collection; or (3) a buyer of the casino license

... efforts to collect checks returned by a bank may be made only by a casino key employee or other casino employee or an attorney-at-law

... checks cashed in conformity with the requirements are valid instruments enforceable at law in the courts, but any check cashed, transferred, conveyed or given in violation of the Act "shall be invalid and unenforceable".

*The Factual Background*

The parties met in the Spring of 1978 and eventually spent considerable time together at the Resorts International Hotel, the first to open a casino in Atlantic City.

Defendant undertook a course of steady gambling. There is not, of course, any record of the play-by-play results of his gambling. There is a partial record reflected in the ledger accounts at the casino, and these show the expected ups and downs, with the net result an increasing loss. Of the typical casino games, the bet on a single number in roulette gives the most precise example. The wheel has a total of 38 spaces, with 1 through 36 numbered, plus zero and double-zero. But a winning bet on a single number is paid at the rate of 35 to 1, as though there were only 36 spaces on the wheel, instead of 37 to 1, the actual odds with 38 spaces. This difference works out to a margin or edge "for the house" of about 5% in the example given.

Hence, a roulette player always betting one chip on a single number can expect, over a very long series of bets, that he will come out with a net loss of one chip for every twenty bets.

Plaintiff says that at an early stage of this activity, defendant asked her to issue her own checks to the casinos so that he could repurchase his "markers", see N.J. S.A. 5:12–101(c), and continue drawing credit to gamble without having his own checks to the casino presented to his own bank.

In any event, without recording the massive detail so far accumulated on discovery, the main pattern disclosed shows that as he lost, defendant gambled more and eventually lost more. He was unable to finance his indulgence further, and the activity collapsed with large sums owed to casinos by both plaintiff and defendant.

Plaintiff asserts having paid defendant's gambling debts to casinos over the period, aggregating the following:

| | |
|---|---|
| 1978 and 1979 | $1,509,200. |
| Jan. and Feb. 1980 | 1,930,000. |
| March, 1980 | 3,132,000. |
| April, 1980 | 4,150,000. |

These total $10,721,200., but plaintiff asserts she loaned to defendant, or advanced for his personal use and benefit, an aggregate of more than $13. million.

Plaintiff also says she holds checks issued by defendant to her by way of supposed repayment toward loans, and that of these a group aggregating $945,000. was put through for collection but returned for insufficient funds, while another group, not put through for collection totals $1,680,000., making a total of unpaid checks she holds, issued to her by defendant, of $2,625,000.

The amended complaint asserts claims on a number of instruments in the nature of notes, and related agreements by way of security or assignment, at least two being combination "Loan Agreement and Security Agreement." One instrument is a May 9, 1980 agreement releasing plaintiff's security interest, under an agreement dated March 21, 1980 "or otherwise, in any of debtor's property." As to this last instrument, plaintiff says it was given on a condition that it was to be used to enable defendant to reach a settlement with Resorts International on all claims it had against both plaintiff and defendant, and that if the settlement could not be accomplished, the release was to be void and the security agreement was to remain effective to protect plaintiff.

Plaintiff says that defendant disregarded the condition by settling out all the claims against himself but not those against plaintiff, yet he filed a UCC termination statement on plaintiff's security and applied that same property interest as security to Resorts or a bank to achieve his own settlement.

This aspect of the case seems to have arisen after Resorts International sued both plaintiff and defendant in Superior Court, and in an effort to settle that suit, which is still undisposed of, the court is told, on Resort's claim against plaintiff.

Also, it should be noted that Count 11 of the Amended Complaint, grounded on Exhibits J-1 and J-2 to the complaint, was added by the amendment to include a claim on a $200,000 note dated January 2, 1979 (Exh. J-1) and an undated 1979 "Agreement of Modification" which refers to a promissory note of January 2, 1979 and a security agreement dated January 4, 1979, both of which were thereby modified (Exh. J-2).

Most of the instruments attached to the complaint carry only the year 1979 and are otherwise without date. Four of them have internal references dealing with interest from and after November 1, 1979 (these are Exh. A-1, B-1, C-1 and D-1) and are presented to accompany four 1979 notes for $200,000., $200,000., $100,000. and $90,-000. (total $590,000).

The other note, Exh. J-1 is dated January 2, 1979 and is for $200,000. Suit on it was begun by amendment to add Count 11, plaintiff says, because while the note calls for only contingent interest (a stated percentage of the profits "if any" of specified enterprises), and while there has evidently not been an accountant's certification of the amount of the contingent interest, if any, the note does provide for the payment of an advance toward interest of $50,000. a year by weekly payments of $961.54, (which works out to 8 cents more than $50,000. over 52 weeks), a presumptive rate of 25% interest. Plaintiff says defendant made these weekly payments until he learned of the filing of this suit in late September, 1981, at which point he ceased making further payments and this was regarded as a default.

It should also be said that the grouping of the undated notes, Exh. A, B, C and D, with the separate instruments, Exh. A-1, B-1, C-1 and D-1, depends entirely on their marking as exhibits, since nothing by way of internal recital or reference beyond the face amount of the note identifies or relates each of them.

Each of the set of notes, Exh. A, B, C and D also is a promise for payment of stated principal sum, "bearing no interest",

and to be due and payable 60 days after written demand, plus a clause for an election to declare payment due in the event of various conditions.

Each of the separate instruments, Exh. A-1, B-1, C-1 and D-1 calls for interest equal to the bank interest rate paid by the "Secured Party" on the principal sum, payable when principal repayments are made or, in the discretion of the "Secured Party" in monthly installments from November 1, 1979. Plaintiff is the "Secured Party" and the indication at argument was that these instruments were prepared in late October, 1979 and either signed about the end of that month or the beginning of the next. Blanks for dates are not filled in. Lines for witnesses carry no signature.

Then there is an instrument dated only "1979" labelled a "Security Agreement" (Exh. E). It recites that defendant has borrowed from plaintiff and has executed "promissory notes", but the notes are not identified by date, amount, aggregate, or otherwise.

It purports to grant plaintiff a "security interest" in specified collateral, i.e.,

... 18.5% of defendant's interest in the "net cash flow" (defined) in the Zarin Family Limited Partnership (ZFLP) and

... defendant's 83⅓% stockholder's interest in the DRZ Corp., (Pa).

In addition to many other terms in the 7-page document, it also provides that plaintiff agrees not to file the agreement under the U.C.C. without defendant's written consent, except in case of defendant's default, death or disability.

It is possible that this instrument, Exh E, was prepared and signed in late October or early November, 1979 at the time Exh. A, A-1, B, B-1, C, C-1 and D, D-1 were, but no ruling on the point can be made on the present cross-motions with any confidence.

Then there are two instruments, each headed "Loan Agreement and Security Agreement". The first is dated February 11, 1980 and is Exh. G. The second is dated March 21, 1980 and is Exh. I.

Both read very much the same, except for provisions to hold specified assets in escrow, a provision for subordination under specified conditions, a provision for a limited power of attorney, and the like.

Both recite that defendant has borrowed money from plaintiff and may request further loans which plaintiff may make. Both also refer to the "obligations" to be secured as "all monetary loans" from plaintiff to defendant including "all future loans", as evidenced by "unpaid checks" signed by defendant in the possession of plaintiff. There is no list attached to either instrument of the then existing checks or their amounts.

The court asked at argument whether the March 21, 1980 instrument, Exh. I, replaced the February 11, 1980 instrument, Exh. G, and was told that this involved disputed issues of fact.

Finally there is an instrument dated March 12, 1980, Exh. H (and thus made between the dates of the last two instruments mentioned, Exh. G and I), which purports to be an assignment from defendant to plaintiff. It recites a consideration of "$1.00 and other lawful consideration". The intangible asset transferred is 12% of defendant's "right, title and interest in any income, profit, distribution, dividend or other form of remuneration * * * from the Marina Towers condominium project by virtue of his ownership therein through the Zarin Family Limited Partnership as reflected in the attached Zarin Family Limited Partnership Agreement" (but the ZFLP Agreement is not attached).

The recitals indicate that defendant was the general partner of and owned 83.34% of the ZFLP; that the ZFLP itself was a 50% partner in the Marina Towers Associates (a general partnership). Thus, the "assignment" works out to 5% of the income, etc., of the Marina Towers project [0.8334 × 0.5 × 0.12 = 0.05 or 5%].

The court's question at argument was whether this instrument was by way of security or by way of payment in satisfaction. See, e.g., *Scott v. Stewart*, 1 N.J. 60, 61 A.2d 765 (1948) requiring a deed to be treated as a mortgage where it was intended solely as security for advances made.

Plaintiff says it was a gift; defendant says there was no consideration and that it was not a gift.

If it were a gift under seal, then in the absence of fraud or illegality it would not be open to a showing of lack of consideration, *Aller v. Aller*, 40 N.J.L. 446 (Sup. 1878). The same is true of a release under seal, *Braden v. Ward*, 42 N.J.L. 518 (Sup. 1880).

However, the instrument, Exh. H, while reciting that the "undersigned" set their hands "and seals", does not show either a seal in fact or a scroll or ink or other device "by way of a seal" See N.J.S.A. 1:1–2.1, and *Coral Gables v. Kretschmer*, 116 N.J.L. 580, 184 A. 825 (E & A, 1936) explaining that no recital is needed when there is a seal in fact, but is essential when a scroll, or ink or other device is used "by way of a seal". The recital is essential to show that the substitute was intended to be "by way of seal". And in *Continental Purchasing Co. Inc. v. Daniels*, 123 N.J.L. 33, 7 A.2d 887 (Sup.1939), it was held that the use of the recital alone, with neither a seal in fact nor a substitute in its place, was insufficient to make the document an instrument under seal. That is this case.

·There is also a dispute on the question whether any of the notes are unrelated to defendant's gambling. Plaintiff says the 4 notes Exh. A, B, C and D, totalling $590,-000. had nothing to do with gambling. Yet, in depositions taken September 15, 1982 there is testimony that $100,000. borrowed May 1, 1977 in cashier's checks of $10,000. each from the Bank of Montreal was applied by handing 3 of them to defendant which he endorsed for deposit, while the other 7 were deposited in plaintiff's own accounts to cover checks she had drawn to Resorts. Also that on October 26, 1979, plaintiff borrowed $100,000. from Sun Bank of Miami and deposited them in her accounts to cover checks previously drawn to Resorts. Also that on November 1, 1979 plaintiff borrowed $100,000. from

Toronto Dominion Bank and deposited it in her accounts to cover checks previously written to Resorts.

Disputes of fact such as these, and others, cannot be resolved on the present motions for summary judgment, and so the analysis is turned to a question of law. *The applicability and effect of N.J.S.A. 2A:40–3.*

This is the present statute, derived from sec. 2 of the 1797 Act to prevent gaming, on which the decision in *Schwartz v. Battifarano*, 2 N.J. 478, 67 A.2d 148 (1949) was based.

If it applies, its effect would be to render "utterly void and of no effect" all promises, etc., made by defendant if part of the consideration is money knowingly lent or advanced to help or facilitate gambling declared unlawful by N.J.S.A. 2A:40–1.

No doubt, N.J.S.A. 2A:40–1 must be read together with N.J.S.A. 5:12–124 and other pertinent parts of the Casino Control Act, such as N.J.S.A. 5:12–101, dealing with checks, loans, credit or advance of anything of value to enable a person to take part in gaming activity as a player.

Defendant has argued that N.J.S.A. 5:12–124 is constitutionally defective under *N.J. Const. 1947*, Art. 4, sec. 7, par. 5 forbidding the amendment of laws by reference to title only and requiring the section amended to be inserted at length. The contention is that by saying that "N.J.S. 2A:40–1 * * * shall not apply" to a casino licensee or to a player who "engages in gaming as authorized herein" the Legislature amended N.J.S. 2A:40–1 by reference to its title only, without inserting it at length.

The point will not be considered or decided here at this time, at least for the reason that there has been no certification to the Attorney-General of New Jersey as required by 28 U.S.C. § 2403(b); and also because the question involves the State, rather than the federal, constitution and seems not to have been considered by any reported New Jersey decision. For present purposes it is enough to read the section as though it did not refer to N.J.S. 2A:40–1 at all but was written in the form: "It shall be lawful for any person * * * to engage in gaming as authorized herein."

This sharpens the question to one whether conduct otherwise coming within the terms of N.J.S. 2A:40–1, but legalized in one form or another when engaged in pursuant to the specified restrictions and control, remains unlawful when engaged in not in compliance with those restrictions and control.

The New Jersey statutes decisions indicate that for all the forms of legalized gambling that have been authorized, there is an insistence on strict regulation and control. See, e.g., N.J.S.A. 5:5–69 through 71 (pari-mutuel horse racing); 5:8–6 and 12 (bingo and raffles); *Resorts Int'l v. Salomone*, 178 N.J.Super 598, at 602–604, 429 A.2d 1078 (App.1981); *Caribe Hilton Hotel v. Toland*, 63 N.J. 301, 307 A.2d 85 (1973).

Casino gaming is the only form of legalized gambling in New Jersey for which credit is authorized and in accordance with the recommendations of the Governor's Staff Policy Group, 178 N.J.Super. at 606, 429 A.2d 1078, strictly controlled because ready, unlimited credit can have a "pernicious effect" upon the compulsive or imprudent player.

Thus, whether the subject be approached from N.J.S.A. 2A:40–3 or from N.J.S.A. 5:12–101, the result is the same. When plaintiff issued checks to defendant, or to a casino, or established her own credit line, it was knowingly to help or facilitate gaming by lot or chance through a method not allowed by the Casino Control Act and therefore not rendered lawful by it. Or, it may be analyzed by looking at N.J.S.A. 5:12–101 and realizing that only casino licensees or person licensed under the Act may deal with checks, loans, credits or advances of anything of value to enable a person to take part in gaming activity as a player, sec. a, and then may do so only under the very strict requirements of sections b, c, d, and e. Section f makes it clear that only those checks cashed in conformity with the Act shall be valid instru-

ments, enforceable in the courts. It also says that any check cashed, transferred, conveyed or given in violation of the Act shall be invalid and unenforceable.

The policy of the Casino Control Act would be wholly frustrated if its strict controls could be circumvented so easily. While recognizing that credit is essential if the objects of the legalization were to be achieved, see N.J.S.A. 5:12–1, the importance of preventing undesirable activities by means of strict controls was in the forefront.

It is with this kind of concern in mind that New Jersey has ruled that "checks given for the purpose of facilitating gambling in licensed casinos [are] sui generis", and that where a check of that kind is void for non-compliance with the regulations, the underlying obligation is void as well. *Resorts*, supra, at 605–606, 429 A.2d 1078. As the court observed,

> "Voiding the check would be meaningless if the obligation it represents remains. Thus, we shun an interpretation of this statute that would render its express provisions meaningless." 178 N.J. Super. at 606, 429 A.2d 1078.

Plaintiff is not a casino licensee or a person otherwise licensed under the Act. She was accordingly not allowed to cash any check, make any loan, or otherwise allow to defendant any credit or advance "to enable" defendant "to take part in gaming activity as a player". Obviously, a licensed casino could do so but only under the strict controls of the Act which, had plaintiff been applying them, would not have left her holding worthless notes, security agreements, assignments and unpaid checks.

The *Caribe Hilton* case, supra, relied on by plaintiff, is not to the contrary. That case reviewed the history of gambling law in New Jersey in the context of a claim to recover, in the New Jersey courts, a gambling debt in another jurisdiction (Puerto Rico) where that kind of gambling had been legalized. The existing law of New Jersey precluded recovery here on a gambling debt even though valid in the jurisdic-

tion where it was incurred and that view was very strict, as evidenced by the excerpts from and discussion of *Watson v. Murray*, 23 N.J.Eq. 257 (Ch.1872) and *Flagg v. Baldwin*, 38 N.J.Eq. 219 (E & A 1884).

Recognizing that New Jersey continues to take a strict view of those forms of gambling then prohibited, the court viewed the authorization of some kinds of gambling as indicating that State policy no longer condemned gambling per se. Rather, the policy was described as one of "carefully regulating certain permitted forms of gambling" while prohibiting all others entirely. Because Puerto Rico seemed to follow the same course, of allowing a state lottery, bingo and on-track parimutuel betting on horses subject to regulation (as in New Jersey) and roulette, dice and cards in licensed gambling rooms (not then in New Jersey), and allowed recovery from a loser except "when the claim is excessive, or may * * * exceed the customs of a good father of a family", New Jersey modified its position to allow the suit to stand.

However, this was qualified to the extent that the trial court was directed to satisfy itself that the gambling debt was legally contracted, that the establishment operated under a valid license, that no laws, rules or regulations were offended, and also to allow defendant to assert any and all defenses he could raise had he been sued in Puerto Rico.

This is a narrow modification and in no way implies or suggests that the Supreme Court of New Jersey was "letting down the bars" in respect to regulations and controls. On the contrary, it insisted that they be shown to have been complied with.

In view of its insistence on such a showing as to a gambling debt incurred in another jurisdiction, the decision hardly stands for the proposition that anything less than strict compliance will do for claims arising out of gambling activities within New Jersey.

*Conclusion.*

Defendant's motion for partial summary judgment is accordingly granted, to the extent of a declaratory ruling that claims based on loans or transfers, part of the consideration of which was to enable defendant to participate in casino gaming activity at casinos in Atlantic City as a player, are void, invalid and unenforceable because not made in accordance with the restrictions and controls imposed by law under the Casino Control Act.

While defendant's motion was originally directed to specific counts of the amended complaint, the well-established New Jersey rule that the courts will not lend their aid to the recovery of claims on unlawful contracts requires that the ruling apply to all counts for which the underlying transactions are so tainted.

Plaintiff's cross-motion for summary judgment on the first four counts (the notes which are Exhibits A, B, C & D to the amended complaint), and the Eighth Count (based on the purported assignment of March 12, 1980, Exhibit H to the amended complaint) is denied.

The activities of the parties as recorded in various checks and related transactional documents, ledger sheets at the casino, and the like are voluminous and in such detail as to make it impossible for the court to correlate them to the various notes and other instruments to which the allegations of the amended complaint are geared.

For example there was delivered to the court on September 7, 1983 a large box of photocopies of checks drawn by David Zarin on various accounts on his name to Resorts International, and checks of DMZ Corporation to plaintiff, which appear to be "advance interest" checks on the note, Exh. J–1, beginning with a series of weekly checks of $961.54 each, and later becoming a series of $4,000. checks each month (which does not work out to $50,000 a year), and no doubt others. These photocopies of checks are in loose bundles, unverified, not in sequence except in a general way, and unaccompanied by any list or tabulation. The task of organizing these would be a formidable one for a fact finder, and in any event cannot be undertaken on a motion for summary judgment.

Motions for summary judgment are not suited to deal with such a complex and massive set of facts. The decision is therefore confined to a matter of law, without regard to the form of any given item but directed to the substance.

Plaintiff argues that her checks to casinos were not loans for gambling but, at most, payment of defendant's gambling debts previously incurred. However, the facts are not in dispute, and there is no genuine issue on the point, that when plaintiff directly or indirectly paid a gambling debt already incurred, it was for the purpose and with the knowledge that to do so would clear defendant's line of credit at the casino involved and thus served to enable him to take part in gaming activity as a player.

This is not a case where a third party makes loans to a gambler on general credit and without knowledge of the use to which the loan would be put. Plaintiff's own answers to depositions and testimony on deposition, as well as the supporting records, show that the plaintiff was fully aware of defendant's massive gambling, his inability to continue to gamble without the loans, and his desire for the loans not to pay his debts and stop, but to pay his debts to gamble even more. As to that aspect of the lawsuit, such loans and promises cannot be recovered no matter which count is affected.

It will be a matter for trial to see whether the evidence provides a basis for a finding of fact that a particular loan or note or other instrument was not commingled with tainted activities.

There were also a number of procedural motions, mainly directed to further discovery. These are not dealt with here and for formal purposes only are denied without prejudice to renewal before the Magistrate.

The ruling will also affect the preparation for trial, for which both sides have

demanded a jury. The present ruling on the law will no doubt require that another pretrial conference be held and an order entered to identify the scope and extent of the matters left for trial. Since there are such bulky exhibits by way of checks, ledger accounts and the like, which a jury may find extremely difficult to deal with, the parties may find it desirable to discuss between themselves and with the Magistrate, the utility of selecting a competent accountant who could be appointed as a special master under F.R.Civ.P. 53, to examine the records involved, hear the testimony, and make findings that will trace the underlying transactions into the various notes and other instruments on which the amended complaint is based. Those findings, under the Rule, can be read to the jury as evidence, and the parties will be free to offer their own evidence in contradiction if they disagree with any finding. The process will inevitably involve an expense, but that will be far less than what would otherwise be assuredly a lengthy and expensive jury trial.

Submit order accordingly.