DAVID ZARIN AND LOUISE ZARIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21371-86.          Filed May 22, 1989.

*Karl William Kolbe, Jr.,* and *David R. Hardy,* for the petitioners.
*Patricia Y. Taylor,* for the respondent.

OPINION

COHEN, *Judge:* Respondent determined deficiencies of $2,466,622 and $58,688 in petitioners' Federal income taxes for 1980 and 1981, respectively.

In the notice of deficiency, respondent determined that petitioners had income in 1980 from larceny by trick and deception. Respondent has abandoned that position. All of the other issues raised in the notice of deficiency have been settled. In his answer, respondent asserted that petitioners realized additional taxable income of $2,935,000 in 1981 through cancellation of indebtedness. The sole issue for decision is whether petitioners had income from discharge of gambling indebtedness during 1981.

Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code, as amended and in effect for the years in issue. All of the facts have been stipulated. The facts set forth in the stipulation are incorporated as our findings by this reference.

Petitioners resided in Atlantic City, New Jersey, at the time they filed their petition in this case. They timely filed joint Federal income tax returns for 1980 and 1981 with the Internal Revenue Service Center, Holtsville, New York.

David Zarin (petitioner) was a professional engineer involved in the development, construction, and management of multi-family housing and nursing home facilities. In 1978, 2 years after New Jersey passed the Casino Control Act, N.J. Stat. Ann. sec. 5:12-101 et seq. (West 1988), legalizing casino gambling in Atlantic City, petitioner began developing various housing projects in Atlantic City, New Jersey.

Petitioner occasionally stayed at Resorts International Hotel, Inc. (Resorts), in Atlantic City in connection with his construction activities. Prior to 1978, petitioner had gambled on credit both in Las Vegas, Nevada, and in the Bahamas. In June 1978, petitioner applied to Resorts for a $10,000 line of credit to be used for gambling. After a credit check, which included inquiries with petitioner's banks and "Credit Central," an organization that maintains records of individuals who gamble in casinos, the requested line of credit was granted, despite derogatory information received from Credit Central.

The game most often played by petitioner, craps, creates the potential of losses or gains from wagering on rolls of dice. When he played craps at Resorts, petitioner usually bet the table limit per roll of the dice. Resorts quickly

became familiar with petitioner. At petitioner's request, Resorts would raise the limit at the table to the house maximum. When petitioner gambled at Resorts, crowds would be attracted to his table by the large amounts he would wager. Gamblers would wager more than they might otherwise because of the excitement caused by the crowds and the amounts that petitioner was wagering. Petitioner was referred to as a "valued gaming patron" by executives at Resorts.

By November 1979, petitioner's permanent line of credit had been increased to $200,000. Despite this increase, at no time after the initial credit check did Resorts perform any further analysis of petitioner's creditworthiness. Many casinos extend complimentary services and privileges (comps) to retain the patronage of their best customers. Beginning in the late summer of 1978, petitioner was extended the complimentary use of a luxury three-room suite at Resorts. Resorts progressively increased the complimentary services to include free meals, entertainment, and 24-hour access to a limousine. By late 1979, Resorts was extending such comps to petitioner's guests as well. By this practice, Resorts sought to preserve not only petitioner's patronage but also the attractive power his gambling had on others.

Once the line of credit was established, petitioner was able to receive chips at the gambling table. Patrons of New Jersey casinos may not gamble with currency, but must use chips provided by the casino. Chips may not be used outside the casino where they were issued for any purpose.

Petitioner received chips in exchange for signing counter checks, commonly known as "markers." The markers were negotiable drafts payable to Resorts drawn on petitioner's bank. The markers made no reference to chips, but stated that cash had been received.

Petitioner had an understanding with Gary Grant, the credit manager at Resorts, whereby the markers would be held for the maximum period allowable under New Jersey law, which at that time was 90 days, whereupon petitioner would redeem them with a personal check. At all times pertinent hereto, petitioner intended to repay any credit amount properly extended to him by Resorts and to pay Resorts in full the amount of any personal check given by

him to pay for chips or to reduce his gambling debt. Between June 1978 and December 1979, petitioner incurred gambling debts of approximately $2.5 million. Petitioner paid these debts in full.

On October 3, 1979, the New Jersey Division of Gaming Enforcement filed with the New Jersey Casino Control Commission a complaint against Resorts and several individuals, which alleged 809 violations pertaining to Resorts' casino gaming credit system, its internal procedures, and its administrative and accounting controls. Of those 809 violations, 100 were specifically identified as pertaining to petitioner and a gambling companion. Pursuant to a request for a cease and desist order contained in the complaint, a Casino Control Commissioner issued an emergency order on October 9, 1979. That order provided, in relevant part:

> 5. Effective immediately, Resorts shall not issue credit to any patron whose patron credit reference card indicates that the credit now outstanding exceeds the properly approved credit limit. In determining whether a credit limit has been exceeded, all yet undeposited checks received in payment of a counter check or checks shall be included as credits.

After the emergency order was issued, Resorts began a policy of treating petitioner's personal checks as "considered cleared." Thus, when petitioner wrote a personal check it was treated as a cash transaction, and the amount of the check was not included in determining whether he had reached his permanent credit limit. In addition, Resorts extended petitioner's credit limit by giving him temporary increases known as "this trip only" credit. Although not specifically addressed by the New Jersey Casino Control regulations in effect during 1979 and 1980, a "this trip only" credit increase was a temporary credit increase for a patron's current trip to Atlantic City, and was required to be reduced before the patron's return. Both of these practices effectively ignored the emergency order. Petitioner did not understand the difference between "this trip only" credit and his permanent credit line, and he thought that he no longer had a credit limit.

By January 1980, petitioner was gambling compulsively at Resorts. Petitioner was gambling 12-16 hours per day, 7 days per week in the casino, and he was betting up to

$15,000 on each roll of the dice. Petitioner was not aware of the amount of his gambling debts.

On April 12, 1980, Resorts increased petitioner's permanent credit line to $215,000, without any additional credit investigation. During April 1980, petitioner delivered personal checks and markers in the total amount of $3,435,000 that were returned to Resorts as having been drawn against insufficient funds. On April 29, 1980, Resorts cut off petitioner's credit. Shortly thereafter, petitioner indicated to the Chief Executive Officer of Resorts that he intended to repay the obligations.

On November 18, 1980, Resorts filed a complaint in New Jersey State Court seeking collection of $3,435,000 from petitioner based on the unpaid personal checks and markers. On March 4, 1981, petitioner filed an answer, denying the allegations and asserting a variety of affirmative defenses.

On September 28, 1981, petitioner settled the Resorts suit by agreeing to make a series of payments totaling $500,000. Petitioner paid the $500,000 settlement amount to Resorts in accordance with the terms of the agreement. The difference between petitioner's gambling obligations of $3,435,000 and the settlement payments of $500,000 is the amount that respondent alleges to be income from forgiveness of indebtedness.

On July 8, 1983, Resorts was fined $130,000 for violating the Emergency Order on at least 13 different occasions, 9 of which pertained directly to credit transactions between Resorts and petitioner.

## Burden of Proof

We are faced first with a dispute as to the burden of proof. Petitioner argues that, to the extent that factual issues are involved, the burden of proof is on respondent with respect to the discharge of indebtedness issue because it constitutes an increase in the deficiency for 1981, and because it constitutes a new matter. Respondent contends otherwise. We agree with petitioner.

Rule 142(a) provides that the burden of proof is on petitioner, "except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in his answer, it shall be upon the respondent." A new

position taken by respondent is not necessarily a "new matter" if it merely clarifies or develops respondent's original determination without requiring the presentation of different evidence, being inconsistent with respondent's original determination, or increasing the amount of the deficiency. *Achiro v. Commissioner,* 77 T.C. 881, 889-891 (1981).

The ground on which the increased deficiency for 1981 asserted in the answer is based, that petitioner had income from the discharge of indebtedness, clearly requires different evidence from the ground originally asserted in the notice of deficiency, that the income was received in 1980 from larceny by trick and deception. Respondent's new position raised in his amended answer, therefore, constitutes a new matter, so that respondent bears the burden of proof. See *Carland, Inc. v. Commissioner,* 90 T.C. 505, 542 (1988); *Estate of Falese v. Commissioner,* 58 T.C. 895, 899 (1972). That the case is fully stipulated does not change the burden of proof. Rule 122(b). In view of this result, we need not consider whether "increase in deficiency" for purposes of Rule 142(a) is determined with reference to each year in issue, as petitioners contend, or on an aggregate basis for all years, as respondent contends. In this regard, we note that for most purposes, the Internal Revenue Code treats individual years as distinct. See, e.g., sec. 6501 (statute of limitations); sec. 170(b) (charitable deduction limitations). At least for jurisdictional purposes, each year must be separately considered. See *Stamm International Corp. v. Commissioner,* 84 T.C. 248, 252-255 (1985).

## *Income From the Discharge of Indebtedness*

In general, gross income includes all income from whatever source derived, including income from the discharge of indebtedness. Sec. 61(a)(12). Not all discharges of indebtedness, however, result in income. See sec. 1.61-12(a), Income Tax Regs., "The discharge of indebtedness, in whole or in part, *may* result in the realization of income." (Emphasis supplied.) The gain to the debtor from such discharge is the resultant freeing up of his assets that he would otherwise have been required to use to pay the debt. See *United States v. Kirby Lumber Co.,* 284 U.S. 1 (1931).

Respondent contends that the difference between the $3,435,000 in personal checks and markers that were returned by the banks as drawn against insufficient funds and the $500,000 paid by petitioner in settlement of the Resorts suit constitutes income from the discharge of indebtedness. Petitioner argues that the settlement agreement between Resorts and himself did not give rise to such income because, among other reasons, the debt instruments were not enforceable under New Jersey law and, in any event, the settlement should be treated as a purchase price adjustment that does not give rise to income from the discharge of indebtedness.

Petitioner argues that gambling and debts incurred to acquire gambling opportunity have always received special treatment at common law and in the Internal Revenue Code and that agreeing with respondent in this case would result in taxing petitioner on his losses. Petitioner relies on *United States v. Hall*, 307 F.2d 238 (10th Cir. 1962), as establishing a rule that the cancellation of indebtedness doctrine is not applicable to the settlement of a gambling debt.

The parties have primarily focused their arguments on whether the debt instruments memorializing the credit transactions were legally enforceable and whether legal enforceability is of significance in determining the existence of income from discharge of indebtedness. Petitioner argues that his debt was unenforceable and thus there was no debt to be discharged and no resulting freeing up of assets because his assets were never encumbered. Petitioner relies on N.J. Stat. Ann. sec. 5:12-101(f) (West 1988), and *Resorts International Hotel, Inc. v. Salomone*, 178 N.J. Super. 598, 429 A.2d 1078 (App. Div. 1981), in arguing that the gambling debts were unenforceable.

Because he bears the burden of proof, respondent can prevail only if the stipulated facts support a conclusion that a discharge of indebtedness occurred that resulted in taxable income under the law. Respondent has not proven facts from which we can conclude that the debts were legally enforceable. We must decide, therefore, whether legal enforceability is a prerequisite to recognition of income in this case.

## Enforceability

In *United States v. Hall, supra,* the taxpayer transferred appreciated property in satisfaction of a gambling debt of an undetermined amount incurred in Las Vegas, Nevada. The Commissioner sought to tax as gain the difference between the amount of the discharged debt and the basis of the appreciated property. Although licensed gambling was legal in Nevada, gambling debts were nevertheless unenforceable. The Court of Appeals concluded that, under the circumstances, the amount of the gambling debt had no significance for tax purposes. The court reasoned that, "The cold fact is that taxpayer suffered a substantial loss from gambling, the amount of which was determined by the transfer." 307 F.2d at 241. The Court of Appeals relied on the so-called "diminution of loss theory" developed by the Supreme Court in *Bowers v. Kerbaugh-Empire Co.,* 271 U.S. 170 (1926). In that case, the taxpayer borrowed money that was subsequently lost in a business transaction. The debt was satisfied for less than its face amount. The Supreme Court held that the taxpayer was not required to recognize income from discharge of a debt because the transaction as a whole lost money.

The Court of Appeals for the Tenth Circuit in *Hall* quoted at length from *Bradford v. Commissioner,* 233 F.2d 935 (6th Cir. 1956), which noted that the *Kerbaugh-Empire* case was decided before *United States v. Kirby Lumber Co.,* 284 U.S. 1 (1931), and *Burnet v. Sanford & Brooks Co.,* 282 U.S. 359 (1931), and had been "frequently criticized and not easily understood." Subsequent developments further suggest that *Kerbaugh-Empire* has lost its vitality. See *Vukasovich, Inc. v. Commissioner,* 790 F.2d 1409 (9th Cir. 1986), revg. a Memorandum Opinion of this Court, discussed at length, *infra.*

In *Commissioner v. Tufts,* 461 U.S. 300 (1983), the Supreme Court examined the economic realities associated with the cancellation of a nonrecourse obligation. Although a nonrecourse mortgage does not personally obligate the borrower or create a right against the borrower's general assets, the Supreme Court recognized the necessity of treating nonrecourse obligations as enforceable loans both when the obligations are made and when they are dis-

charged. Thus, upon sale of mortgaged property, the seller-original borrower must include the amount of the nonrecourse mortgage assumed by the purchaser in calculating the amount realized from sale, even when the fair market value of the property is less than the outstanding amount of the nonrecourse obligation. Indicating a concern with symmetry, the Supreme Court observed in *Tufts:*

The rationale for this treatment is that the original inclusion of the amount of the mortgage in basis rested on the assumption that the mortgagor incurred an obligation to repay. Moreover, this treatment balances the fact that the mortgagor originally received the proceeds on the nonrecourse loan tax-free on the same assumption. Unless the outstanding amount of the mortgage is deemed to be realized, the mortgagor effectively will have received untaxed income at the time the loan was extended and will have received an unwarranted increase in the basis of his property. * * * [461 U.S. at 309-310.]

In the instant case, symmetry from year to year is not accomplished unless we treat petitioner's receipt of the loan from Resorts (i.e., the markers converted to chips) and the subsequent discharge of his obligation to repay that loan in a consistent manner. Petitioner received credit of $3,435,000 from Resorts. He treated these amounts as a loan, not reporting any income on his 1980 tax return. Compare *United States v. Rosenthal,* 470 F.2d 837 (2d Cir. 1972), and *United States v. Rochelle,* 384 F.2d 748 (5th Cir. 1967). The parties have stipulated that he intended to repay the amounts received. Although Resorts extended the credit to petitioner with the expectation that he would continue to gamble, theoretically petitioner could have redeemed the chips for cash. Certainly if he had won, rather than lost, at gambling, the amounts borrowed would have been repaid.

Petitioner argues that he did not get anything of value when he received the chips other than the "opportunity to gamble," and that, by reason of his addiction to gambling, he was destined to lose everything that he temporarily received. Thus, he is in effect arguing, based on *Hall,* that the settlement merely reduced the amount of his loss and did not result in income.

In *Vukasovich, Inc. v. Commissioner, supra,* the taxpayer borrowed approximately $2 million to finance a cattle feeding venture. The cattle were subsequently sold for less

than the full amount of the taxpayer's liability, and he refused to pay the balance owed. The parties to the agreement settled their claims for less than the full amount, and the Commissioner asserted that the taxpayer realized income from cancellation of the debt. The Court of Appeals for the Ninth Circuit concluded that the principles of *Kerbaugh-Empire* had been rejected by the Supreme Court in the subsequent cases cited above, even though the 1926 case had not been specifically overruled. 790 F.2d at 1415-1416. Because we find the reasoning of the Court of Appeals for the Ninth Circuit persuasive, we quote it at length as follows:

> *Kerbaugh-Empire* depended on two premises. First, it held that the cancellation of indebtedness was not income, because income was "gain derived from capital, from labor, or from both combined." *Id.* at 174, 46 S.Ct. at 451. Second, it held that a unitary transactional approach to measuring income made it impermissible to look at receipts in a given year without determining whether they were offsets of losses in another year because while "the [loan] in question is cash gain[,] * * * the borrowed money was lost." *Id.* at 175, 46 S.Ct. at 451. The Commissioner relies primarily on *United States v. Kirby Lumber Co.*, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931); *Burnet v. Sanford & Brooks Co.*, 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955); and *Commissioner v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), to show that these premises are no longer accepted.
>
> Ordinarily the cancellation of indebtedness is gross income. *Kerbaugh-Empire*'s reluctance to tax income from the cancellation of indebtedness stemmed in part from *Eisner v. Macomber*, 252 U.S. 189, 207, 40 S.Ct. 189, 193, 64 L.Ed. 521 (1920) (quoting *Doyle v. Mitchell Brothers Co.*, 247 U.S. 179, 185, 38 S.Ct. 467, 469, 62 L.Ed. 1054 (1918)), which defined income for the purposes of the Sixteenth Amendment as " 'the gain from capital, from labor, or from both combined.' " Because the cancellation of indebtedness could not be attributed to a gain from capital or labor, the result in *Kerbaugh-Empire* followed from the then-existing interpretation of the Sixteenth Amendment. *See Kerbaugh-Empire*, 271 U.S. at 174-75, 46 S.Ct. at 451. Since then, *Glenshaw Glass* has defined gross income in terms of "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." 348 U.S. at 431, 75 S.Ct. at 476. * * *
>
> * * * In *Kirby Lumber*, a company sold its bonds and later repurchased them for less than the sale price. The Supreme Court held that the taxpayer achieved a taxable gain through the freeing of its assets from the obligation to repurchase the bonds at the price of issue, and therefore realized income. *Kirby Lumber* shows that an increase in net worth from the discharge of indebtedness for less than the amount loaned

is income, at least to the extent that it frees up the debtor's assets. Thus, the taxpayer's gain on the loan must be counted as income in the absence of something exceptional about the underlying transaction.

In *Tufts,* the taxpayer sold property subject to a nonrecourse mortgage. The property was worth less than the amount of the mortgage. Because the mortgage was nonrecourse, it could not be said, as it had been in *Kirby Lumber,* that the removal of the debt freed or enhanced the taxpayer's assets. Nonetheless, the Supreme Court ruled that the Commissioner could treat the difference between the initial amount of the loan and the amount repaid as income from the sale of the property.

The Commissioner argues that *Tufts* supports a general rule making irrelevant whether assets were freed because the Court focuses on the receipt of money unbalanced by an obligation to repay, rather than on the nonrecourse nature of the obligation or on the taking of deductions. *See* 461 U.S. at 310 n. 8, 103 S.Ct. at 1832 n. 8. The Commissioner's argument is supported by some authority, *see* Bittker & Thompson, Jr., *Income From the Discharge of Indebtedness: The Progeny of United States v. Kirby Lumber Co.,* 66 Cal.L.Rev. 1159, 1165-66, 1176, 1182 (1978).

However, requiring some benefit to the taxpayer from the transaction creating the indebtedness explains such cases as *Commissioner v. Rail Joint Co.,* 61 F.2d 751 (2d Cir. 1932), which held that no gain was realized when a corporation issued bonds as dividends and repurchased them at less than their face value, and *B.F. Avery & Sons, Inc. v. Commissioner,* 26 B.T.A. 1393 (1932), where a claim that cancellation of indebtedness should be treated as a reduction in the purchase price was analyzed according to whether prior tax benefits had resulted from the higher purchase price. *See generally* J. Sneed, *The Configurations of Gross Income* 322-27 (1967).

We have no doubt that an increase in wealth from the cancellation of indebtedness is taxable where the taxpayer received something of value in exchange for the indebtedness. Unlike *Tufts, Rail Joint* may not have provided an economic benefit to the taxpayer from the transaction, and the statement in *Tufts* may not apply to such cases. Because Vukasovich received money in exchange for the indebtedness, we need not determine the limits of *Tufts.* We decline to address the issue. [790 F.2d at 1414-1415.]

We conclude here that the taxpayer did receive value at the time he incurred the debt and that only his promise to repay the value received prevented taxation of the value received at the time of the credit transaction. When, in the subsequent year, a portion of the obligation to repay was forgiven, the general rule that income results from forgiveness of indebtedness, section 61(a)(12), should apply.

Legal enforceability of an obligation to repay is not generally determinative of whether the receipt of money or

property is taxable. *James v. United States,* 366 U.S. 213, 219 (1961). Under the "all events test," only the fact of liability and the amount owed need be fixed as of the end of a taxable year in order to give rise to a deduction by an accrual basis taxpayer; legal liability is not required. *Burlington Northern Railroad v. Commissioner,* 82 T.C. 143, 151 (1984). Unenforceability of an underlying gambling debt is not a bar to the recognition of income by an accrual method gambling casino. *Flamingo Resort, Inc. v. United States,* 664 F.2d 1387 (9th Cir. 1982). Enforceability may affect the timing of recognition of income; other factors fix the amount to be recognized. Cf. *United States v. Hughes Properties,* 476 U.S. 593, 602-604 (1986).

Here the timing of recognition was set when the debt was compromised. The amount to be recognized as income is the part of the debt that was discharged without payment. The enforceability of petitioner's debts under New Jersey law did not affect either the timing or the amount and thus is not determinative for Federal income tax purposes. We are not persuaded that gambling debts should be accorded any special treatment for the benefit of the gambler—compulsive or not. As the Court of Appeals in *United States v. Hall* stated, "The elimination of a gambling debt is * * * a transaction that may have tax consequences independent of the *amount* of the debt and certainly cannot be used as a tool to avoid a tax incident which is shielded only by the screen of its unenforceable origin." 307 F.2d at 242.

### Disputed Debt

Petitioner also relies on the principle that settlement of disputed debts does not give rise to income. *N. Sobel, Inc. v. Commissioner,* 40 B.T.A. 1263 (1939), cited with approval in *Colonial Savings Association v. Commissioner,* 85 T.C. 855, 862-863 (1985), affd. 854 F.2d 1001 (7th Cir. 1988). Prior to the settlement, the amount of petitioner's gambling debt to Resorts was a liquidated amount, unlike the taxpayer's debt in *Hall.* There is no dispute about the amount petitioner received. The parties dispute only its legal enforceability, i.e., whether petitioner could be legally compelled to pay Resorts the fixed amount he had borrowed. A genuine dispute does not exist merely because

petitioner required Resorts to sue him before making payment of any amount on the debt. The cases cited by petitioner merely require that there be a liquidated debt, i.e., one in which the amount has been determined. See *Colonial Savings Association v. Commissioner*, 85 T.C. at 863; *N. Sobel, Inc. v. Commissioner*, 40 B.T.A. at 1265. In our view, petitioner's arguments concerning his defenses to Resorts' claim, which apparently led to Resorts' agreement to discount the debt, are overcome by (1) the stipulation of the parties that, at the time the debt was created, petitioner agreed to and intended to repay the full amount, and (2) our conclusion that he received full value for what he agreed to pay, i.e., over $3 million worth of chips and the benefits received by petitioner as a "valued gambling patron" of Resorts.

## Deductibility of Gambling Losses

In several different ways, petitioner argues that any income from discharge of his gambling debt was income from gambling against which he may offset his losses; thus, he argues, he had no net income from gambling.

Section 165(d) provides that "Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions." Neither section 165(d) nor section 1.165-10, Income Tax Regs., defines what items are included as gains from wagering transactions. The regulation, however, provides that wagering losses "shall be allowed as a deduction but only to the extent of the gains *during the taxable years* from such transactions." (Emphasis supplied.) Petitioner incurred gambling losses in 1980, but his gain from the discharge of his gambling debts occurred in 1981. That gain is separate and apart from the losses he incurred from his actual wagering transactions. We have no evidence of his actual wagering gains and losses for either year. If we were to effectively allow petitioner to deduct the value of the lost chips from the value of the discharged debt, we would ignore annual accounting and undermine section 165(d) by in effect allowing gambling losses in excess of gambling winnings.

## *Purchase Money Debt Reduction*

Petitioner argues that the settlement with Resorts should be treated as a purchase price adjustment that does not give rise to income from the discharge of indebtedness. He cites the parties' stipulation, which included a statement that, "Patrons of New Jersey casinos may not gamble with currency. All gambling must be done with chips provided by the casino. Such chips are property which are not negotiable and may not be used to gamble or for any other purpose outside the casino where they were issued." Respondent argues that petitioner actually received "cash" in return for his debts.

Section 108(e)(5) was added to the Internal Revenue Code by the Bankruptcy Tax Act of 1980, Pub. L. 96-589, 94 Stat. 3389, 3393, and provides:

(5) PURCHASE-MONEY DEBT REDUCTION FOR SOLVENT DEBTOR TREATED AS PRICE REDUCTION.—If—

   (A) the debt of a purchaser of property to the seller of such property which arose out of the purchase of such property is reduced,

   (B) such reduction does not occur—

      (i) in a title 11 case, or

      (ii) when the purchaser is insolvent, and

   (C) but for this paragraph, such reduction would be treated as income to the purchaser from the discharge of indebtedness,

then such reduction shall be treated as a purchase price adjustment.

Section 108(e)(5) was enacted "to eliminate disagreements between the Internal Revenue Service and the debtor as to whether, in a particular case to which the provision applies, the debt reductions should be treated as discharge income or a true price adjustment." S. Rept. 96-1035 (1980), 1980-2 C.B. 620, 628. Section 108(e)(5) applies to transactions occurring after December 31, 1980. S. Rept. 96-1035, *supra,* 1980-2 C.B. at 622-623. The provisions of this section are not elective.

For a reduction in the amount of a debt to be treated as a purchase price adjustment under section 108(e)(5), the following conditions must be met: (1) The debt must be that of a purchaser of property to the seller which arose out of the purchase of such property; (2) the taxpayer must be solvent and not in bankruptcy when the debt reduction occurs; and (3) except for section 108(e)(5), the debt reduction would

otherwise have resulted in discharge of indebtedness income. Sec. 108(e)(5); 1 B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts, pp. 6-40 - 6-41 (2d ed. 1989); see also *Sutphin v. United States,* 14 Cl. Ct. 545, 549 (1988); *Juister v. Commissioner,* T.C. Memo. 1987-292; *DiLaura v. Commissioner,* T.C. Memo. 1987-291.

In addition to the literal statutory requirements, the legislative history indicates that section 108(e)(5) was intended to apply only if the following requirements are also met: (a) The price reduction must result from an agreement between the purchaser and the seller and not, for example, from a discharge as a result of the bar of the statute of limitations on enforcement of the obligation; (b) there has been no transfer of the debt by the seller to a third party; and (c) there has been no transfer of the purchased property from the purchaser to a third party. S. Rept. 96-1035 (1980), 1980-2 C.B. 620, 628; 1 B. Bittker & L. Lokken, *supra* at 6-40 - 6-41.

It seems to us that the value received by petitioner in exchange for the credit extended by Resorts does not constitute the type of property to which section 108(e)(5) was intended to or reasonably can be applied. Petitioner argued throughout his briefs that he purchased only "the opportunity to gamble" and that the chips had little or no value. We agree with his description of what he bargained for but not with his conclusion about the legal effect.

As indicated above, we are persuaded on the stipulated facts that petitioner received full value for his debt. In arguing that he did not, however, petitioner asserts:

In exchange for his promise to repay Resorts, Petitioner received chips. * * * These chips may be used only to gamble in the Resorts Casino. Furthermore, the record is void of any assertion that Petitioner's life-style equates to cognizable consideration.

Petitioner purchased the opportunity to gamble as he received chips in exchange for his markers. He did not even use the chips to pay for food, beverage, entertainment or hotel/living accommodations while in Atlantic City, as these services were provided to Petitioner by Resorts on a complimentary basis. Upon receipt of the chips, Petitioner immediately proceeded to gamble with these chips. * * *

The corollary to a borrower's receipt of zero cognizable consideration, is that a lender parts with nothing of value. In the instant case petitioner received nothing and Resorts gave up nothing. * * *

* * * * * * *

* * * Furthermore, Petitioner, in entering into the gaming transactions with Resorts, did not receive any item of tangible value. In fact, Petitioner received nothing more than the opportunity to bet on which of 36 permutations of the dice would appear on a given roll of the dice. * * *

In support of an argument that "A debt incurred by a casino patron to acquire gambling opportunity is not a typical commercial debt and as such should not be treated as a typical commercial debt," petitioner argues:

In addition to the character of the gambling debt being different than a typical commercial debt, the Petitioner-Resorts gambling transactions did not occur in the normal commercial debtor-creditor relationship in which a debtor borrows funds from a creditor and uses the loan proceeds elsewhere or uses the funds as purchase money for which he acquires something of value. Petitioner received gambling chips from Resorts. He then promptly gambled and lost the entire amount of chips at Resorts. Petitioner received no consideration from Resorts and was, in fact, $500,000 poorer from his transactions, while Resorts parted with nothing.

In support of an argument that "Tax is not imposed on an opportunity to realize income," petitioner asserts:

Petitioner's receipt of chips on credit represented an opportunity to gamble. The chips, the value of which are not equal to the value of the markers given, *cannot* be negotiated outside of the issuing casino and may be retained by the casino in satisfaction of the markers if presented by the patron for redemption. Accordingly, the only value represented by the chips is their potential income earning power. * * *

While disagreeing with petitioner's assertion as to the value of what he received, we agree that what he received was something other than normal commercial property. He bargained for and received the opportunity to gamble and incidental services, lodging, entertainment, meals, and transportation. Petitioner's argument that he was purchasing chips ignores the essence of the transaction, as more accurately described in his other arguments here quoted. The "property" argument simply overemphasizes the significance of the chips. As a matter of substance, chips in isolation are not what petitioner purchased.

The "opportunity to gamble" would not in the usual sense of the words be "property" transferred from a seller to a purchaser. The terminology used in section 108(e)(5) is

readily understood with respect to tangible property and may apply to some types of intangibles. Abstract concepts of property are not useful, however, in deciding whether what petitioner received is within the contemplation of the section.

Obviously the chips in this case were a medium of exchange within the Resorts casino, and in that sense they were a substitute for cash, just as Federal Reserve Notes, checks, or other convenient means of representing credit balances constitute or substitute for cash. Recognition that foreign currency has, for some purposes, been held to be "property" that qualifies as a capital asset is not in point here. See *National-Standard Co. v. Commissioner*, 80 T.C. 551 (1983), affd. 749 F.2d 369 (6th Cir. 1984). Foreign currency fluctuates in United States dollar value, whereas the chips in question do not.

We conclude that petitioner's settlement with Resorts cannot be construed as a "purchase-money debt reduction" arising from the purchase of property within the meaning of section 108(e)(5).

We have considered the other arguments of the parties and find them unnecessary to disposition of this case or unpersuasive. To reflect concessions,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

NIMS, PARKER, KÖRNER, SHIELDS, HAMBLEN, CLAPP, GERBER, WRIGHT, PARR, and COLVIN, *JJ.*, agree with the majority opinion.

———

TANNENWALD, *J.*, dissenting: The foundation of the majority's reasoning is that Mr. Zarin realized income in an amount equal to the amount of the credit extended to him because he was afforded the "opportunity to gamble." Based upon that theory, the majority concludes that Mr. Zarin is seeking to reduce the amount of his loss and that this approach runs afoul of the now discredited (according to the majority) "diminution of loss" approach of the

Supreme Court in *Bowers v. Kerbaugh-Empire Co.*, 271 U.S. 170 (1926).

I find it unnecessary to rely on *Kerbaugh-Empire* and, therefore, need not embrace or reject the approach of that case. I am constrained to note, however, that it does not follow from the "freeing of asset" approach adopted by the Supreme Court in *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955), that *Kerbaugh-Empire* is moribund for all purposes. Nor does such moribundity flow from *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931), or *Commissioner v. Tufts*, 461 U.S. 300 (1983). See *Colonial Savings Association v. Commissioner*, 85 T.C. 855, 862 n. 11 (1985), affd. 854 F.2d 1001 (7th Cir. 1988).

I think it highly significant that in all the decided cases involving the cancellation of indebtedness, the taxpayer had, in a prior year when the indebtedness was created, received a nontaxable benefit clearly measurable in monetary terms which would remain untaxed if the subsequent cancellation of the indebtedness were held to be tax free. Such is simply not the case herein. The concept that petitioner received his money's worth from the enjoyment of using the chips (thus equating the pleasure of gambling with increase in wealth) produces the incongruous result that the more a gambler loses, the greater his pleasure and the larger the increase in his wealth.[1] Under the circumstances, I think the issue of enforceability becomes critical. In this connection, the repeated emphasis by the majority on the stipulation that Mr. Zarin intended to repay the full amount at the time the debt was created is beside the point. If the debt was unenforceable under New Jersey law, that intent is irrelevant.

It is clear that respondent has not shown that the checks Mr. Zarin gave Resorts were enforceable under New Jersey law. New Jersey law provides that checks issued to pay for gambling are enforceable provided that a set of requirements relating to, among other things, proper payees, dating and holding periods, is met. See N.J. Stat. Ann. sec. 5:12-101 (West 1988). "Any check cashed, transferred,

---

[1] I think it clear that, although theoretically the chips could have been redeemed for cash instead of being used for gambling, any attempt by Mr. Zarin to follow this path would have been known to Resorts' personnel and strongly resisted.

conveyed or given in violation of * * * [those requirements] shall be invalid and unenforceable for the purposes of collection." N.J. Stat. Ann. sec. 5:12-101(f) (West 1988). Furthermore, strict compliance with those requirements is mandatory for a check to be enforceable. *GNOC, Corp. v. Endico,* 692 F. Supp. 1515 (S.D.N.Y. 1988); *Resorts International Hotel, Inc. v. Salomone,* 178 N.J. Super. 598, 429 A.2d 1078 (App. Div. 1981). Respondent simply has not shown that the markers given Resorts by Mr. Zarin were drawn and handled in strict compliance with the statute. In fact, the number of violations of the emergency order asserted against Resorts by the New Jersey gambling commission, including some betting transactions with petitioner, casts substantial doubt on whether the checks[2] were in fact so handled.

Respondent seeks sustenance from *Flamingo Resort, Inc. v. United States,* 664 F.2d 1387 (9th Cir. 1982), which held that unenforceability under Nevada law did not nullify the "all events test" so as to avoid accruability by a casino of accounts receivable represented by markers from gambling patrons.[3] Respondent's reliance on *Flamingo Resort* is misplaced. I think it significant that the Ninth Circuit Court of Appeals made it clear that legal enforeceability could be relevant in determining accruability of income and that its holding was "merely * * * that under the circumstances of this case its absence is not controlling." 664 F.2d at 1391. The foundation of the court's conclusion in *Flamingo Resort* was that the commercial reality was that the casino could expect to collect on those markers in the normal course of events. As the Ninth Circuit Court of Appeals put it: "The debts which the 'markers' represent are * * * fixed; *there is a reasonable expectancy of collection;* and no contention has been made that the amounts cannot be determined with reasonable accuracy." 664 F.2d at 1390 (emphasis supplied).

---

[2]The markers used to extend credit, in the form of drafts drawn by Mr. Zarin on his bank and payable to Resort's order, are checks within the meaning of the Uniform Commercial Code. See N.J. Stat. Ann. sec. 12A:3-104(2) (West 1962); U.C.C. sec. 3-104(2).

[3]We reached the opposite conclusion, based upon a concession by respondent, in *Desert Palace, Inc. v. Commissioner,* 72 T.C. 1033 (1979), revd. without published opinion 698 F.2d 1229 (9th Cir. 1982), a reversal which was foreshadowed in *Flamingo Resort, Inc. v. United States,* 664 F.2d 1387, 1391 n. 8 (9th Cir. 1982).

I do not think any such standard can be met in the instant case. Given the size of Mr. Zarin's indebtedness, the clear indication from the New Jersey Casino Control Commission that violations of the New Jersey gambling law were involved and the specific provisions of New Jersey law as to the unenforceability of gambling debts, I think it obvious that Mr. Zarin would resist any attempt to collect.[4] The fact that such resistance actually occurred supports this point of view. Thus, I think it clear that there was no "reasonable expectancy of collection" and that the circumstances of this case are quite different from those involved in *Flamingo Resort*. In any event, that case dealt with the accruability of income to the casino; here the issue is the existence of income when a gambling debt is discharged.

In resolving that issue, I think it significant that because the debts involved herein were unenforceable *from the moment that they were created*, there was no freeing up of petitioners' assets when they were discharged, see *United States v. Kirby Lumber Co., supra*, and therefore there was no increase in petitioners' wealth that could constitute income. Cf. *Commissioner v. Glenshaw Glass Co., supra*. This is particularly true in light of the fact that the chips were given to Mr. Zarin with the expectation that he would continue to gamble and, therefore, did not constitute an increase in his wealth when he received them in the same sense that the proceeds of a non-gambling loan would. Cf. *Rail Joint Co. v. Commissioner*, 22 B.T.A. 1277 (1931), affd. 61 F.2d 751 (2d Cir. 1932) (cited in *Commissioner v. Tufts*, 461 U.S. at 209 n. 6), where we held that there was no income from the discharge on indebtedness when the amount paid for the discharge was in excess of the value of what had been received by the debtor at the time the indebtedness was created even though the face amount of the indebtedness and hence the taxpayer's liability was reduced; *Fashion Park, Inc. v. Commissioner*, 21 T.C. 600 (1954) (same holding).

I am reinforced in my conclusion by the outcome in *United States v. Hall*, 307 F.2d 238 (10th Cir. 1962). In that

---

[4]It is clear that any inference that Mr. Zarin intended to pay the debts at issue which could be drawn from his stipulated intentions is obviated by his actions in disputing the debt and in settling the debt for less than its face amount.

case, the court held that there was no income from the discharge of gambling indebtedness because the debt was not enforceable under Nevada law, and observed that such a debt "has but slight potential and does not meet the requirements of debt necessary to justify the mechanical operation of general rules of tax law relating to cancellation of debt." 307 F.2d at 241. While a gambling debt is not unenforceable under all circumstances in New Jersey, the indebtedness involved herein was unenforceable, and I agree with the court in *Hall* that an unenforceable "gambling debt * * * has no significance for tax purposes," 307 F.2d at 242, at least where such unenforceability exists from the moment the debt is created.[5]

I find further support for my conclusion from the application of the principle that if there is a genuine dispute as to liability on the underlying obligation, settlement of that obligation will not give rise to income from discharge of indebtedness. *N. Sobel, Inc. v. Commissioner,* 40 B.T.A. 1263 (1939), cited with approval in *Colonial Savings Association v. Commissioner,* 85 T.C. 855, 862-863 (1985), affd. 854 F.2d 1001 (7th Cir. 1988). Respondent simply has not met his burden of showing that the dispute between Resorts and Mr. Zarin was not a genuine dispute as to Mr. Zarin's liability for the underlying obligations, and I believe that, at least as to that debt that was not entered into as required by New Jersey law and was therefore unenforceable, the dispute was in fact genuine. While there is language in *Sobel* and *Colonial Savings* indicating that *United States v. Kirby Lumber Co., supra,* applies when there is a liquidated amount of indebtedness, I do not read that language as *requiring* that *Kirby Lumber* must apply unless the amount is unliquidated, where there is a genuine dispute as to the underlying liability.

I would hold for petitioner.

WELLS, *J.,* agrees with this dissent.

---

[5]Mr. Zarin's permanent line of credit, which might have measured the amount of his indebtedness that could clearly have been enforced ($215,000), was less than the amount he paid by way of settlement ($500,000).

JACOBS, *J.,* dissenting: The majority concludes that petitioner David Zarin had income from discharge of gambling indebtedness in 1981. I would conclude otherwise.

The facts in this case are relatively simple. Petitioner was a compulsive gambler whose addiction Resorts fueled through the extension of credit. By April 1980, Resorts had advanced $3,435,000 to petitioner. Because petitioner had not repaid this amount, on November 18, 1980, Resorts instituted a State court proceeding seeking collection of the $3,435,000. On September 28, 1981, petitioner settled this claim by agreeing to pay Resorts $500,000, which he did.

The New Jersey Superior Court has ruled that debt arising from credit extended against checks to facilitate gambling in a casino is unenforceable if the check is given in violation of New Jersey's Casino Control Act. *Resorts International Hotel, Inc. v. Salomone,* 178 N.J. Super. 598, 429 A.2d 1078 (App. Div. 1981). Similarly, in a suit in which petitioner herein was a defendant, the U.S. District Court for New Jersey ruled that "claims based on loans or transfers [to the defendant], part of the consideration of which was to enable defendant to participate in casino gambling activity at casinos in Atlantic City as a player, are void, invalid and unenforceable because not made in accordance with the restrictions and controls imposed by law under the Casino Control Act." *Nemtin v. Zarin,* 577 F. Supp. 1135, 1147 (D. N.J. 1983).

The credit Resorts extended to petitioner during the first 4 months of 1980 apparently was not in accordance with the restrictions and controls imposed by New Jersey's Casino Control Act. Thus, petitioner's obligation to repay Resorts was invalid and unenforceable.

Obviously, petitioner did not receive the gambling chips out of Resorts' detached or disinterested generosity, but rather he received them with Resorts' expectation that his markers would be paid. Accordingly, the transfer of chips was not a gift from Resorts to petitioner. *Commissioner v. Duberstein,* 363 U.S. 278 (1960).

In my opinion, petitioner's obligation to Resorts was void ab initio, and therefore, I would first hold that petitioner realized income (herein referred to as chip income) in 1980 (a

year at issue) to the extent of the value of the chips received.

It is apparent that petitioner left the chips he obtained through the extension of credit by Resorts on Resorts' gambling tables. For had he won, his markers undoubtedly would have been paid, and this case would not be before us. Accordingly, I would next hold that the amount of petitioner's losses from wagering activities in 1980 equaled or exceeded the amount of chip income.

I recognize that section 165(d) limits losses from wagering transactions to the extent of gains from such transactions. In my opinion, for purposes of section 165(d), the chip income constitutes gain from a wagering transaction, because no such income would have been realized but for the wagering transactions in which petitioner's losses occurred. Thus, I would hold that petitioner is entitled to deduct in 1980 his gambling losses to the extent of the chip income.

While I believe the preceding analysis resolves the tax consequences of petitioner's transaction with Resorts, I feel compelled to address the majority's holding that petitioner had income from discharge of gambling indebtedness in 1981.

Section 61(a)(12) provides that gross income includes income from the discharge of indebtedness. However, as the majority recognizes, not all discharges of indebtedness result in income.

In *United States v. Hall,* 307 F.2d 238, 241 (10th Cir. 1962), the court stated:

The tax statutes are practical, not pure theory.

\*　　\*　　\*　　\*　　\*　　\*　　\*

A gambling loss is a hard reality but a gambling debt, being unenforceable in every state, has but a slight potential and does not meet the requirements of debt necessary to justify the mechanical operation of general rules of tax law relating to cancellation of debt. \* \* \* [Fn. ref. omitted.]

In my opinion, for tax purposes, an unenforceable debt is a contradiction in terms, an oxymoron. It is like shooting craps without dice. For interest on indebtedness to be deductible under section 163, it is well recognized that the indebtedness must be enforceable. I am unable to discern

why the majority imposes a different rule for the inclusion of discharge of indebtedness income. Accordingly, for 1981, I would hold petitioner did not realize discharge of indebtedness income.

The result reached by the majority is tantamount to taxing petitioner on his losses. As stated by the court in *Hall:*

In deciding the income tax effects of cancellation of indebtedness for less than its face amount, a court need not in every case be oblivious to the net effect of the entire transaction. * * * [307 F.2d p. 242.]

I do not wish to be oblivous to the net effect of the transactions before us. I therefore dissent.

RUWE *J.,* dissenting: Although I agree with much of the majority's reasoning in this case, I dissent from that portion of the opinion which holds that section 108(e)(5) is inapplicable to the transaction at issue. I find no support in the language of the statute or the accompanying legislative history for the majority's determination that the gambling chips purchased by petitioner do not constitute "property" for purposes of section 108(e)(5). Because I believe that petitioner acquired "property" from the casino on credit and subsequently negotiated a reduction of his debt to the casino, I would apply section 108(e)(5) in this case.

This is a fully stipulated case. Since all of the facts were agreed to by the parties, our factual findings are controlled by the stipulation of facts. The parties stipulated that *"chips are property* which are not negotiable." (Emphasis added.) In their briefs, both parties requested that the Court find this as a fact. Despite this, the majority fails to adopt this stipulated fact which is critical to the resolution of this case.

It is unclear whether the majority is saying that it is not persuaded of the fact that the chips were "property" or whether the majority decides that section 108 uses the term "property" in a restricted manner. Given the majority's failure to include in its findings of fact that chips are property, I must assume, for purposes of this dissent, that the majority decides that the stipulation fails to support a

factual finding that chips are "property" and also decides that even if they are property in a generic sense, they are not "property" within the meaning of section 108.

The majority agrees that the chips had value. It correctly finds that petitioner paid for the chips by giving markers to the casino, that the markers constituted petitioner's promise to pay money to the casino (majority opinion at p. 1086), and that the chips had a value of over $3 million. (Majority opinion at p. 1096) The parties stipulated that the chips were "property." It is beyond question that gambling chips constitute what is commonly referred to as property. See Black's Law Dictionary, pp. 1095-1096 (5th ed. 1979).

The majority attempts to support its conclusion by pointing out that petitioner's argument that chips are property is inconsistent with other arguments contained in his briefs wherein petitioner attempts to show that he really did not get anything of value when he purchased the chips on credit. (Majority opinion at pp. 1098 and 1099.) It is exceptionally curious that petitioner's arguments, which the majority rejects, are then used by the majority as support for its conclusion that the chips are not property. Having concluded that petitioner received chips having a value equivalent to his markers, it is impossible to describe the gambling chips as anything other than "property." Apparently, cognizant of this dilemma, the majority finally settles on the conclusion that the gambling chips purchased by petitioner were "something other than normal commercial property." (Majority opinion at p. 1099) I take this to be a finding of fact since the term "normal commercial property" does not appear in the relevant statutes, regulations, or legislative history.

The majority's legal conclusion seems to be that gambling chips, being other than "normal commercial property," do not constitute "property" within the meaning of section 108(e)(5). In deciding this legal issue of first impression, the majority fails to define either the term "property" as used in section 108(e)(5) or the term "normal commercial property."

If the term "normal commercial property" has a meaning, there is no reason why gambling chips should not be included. As recently stated by the Supreme Court:

it would seem that basic concepts of fairness (if there be much of that in the income tax law) demand that [gambling] be regarded as a trade or business just as any other readily accepted activity, such as being a retail store proprietor or, to come closer categorically, as being a casino operator or as being an active trader on the exchanges. [*Commissioner v. Groetzinger,* 480 U.S. 23, 33 (1987).]

Chips are certainly "normal commercial property" in a casino's commercial gambling business. If the term "normal commercial property" is meant to preclude the application of section 108(e)(5) to property that is unique or "one of a kind," there is no support for such a conclusion. In any event, neither the statute nor its legislative history restricts its application to "normal commercial property."

The majority concludes on page 1096 that petitioner "received full value for what he agreed to pay, i.e., over $3 million worth of chips."[1] However, on page 1099 the majority concludes that "chips in isolation are not what petitioner purchased." The majority reasons that the value of the chips is really derived from the fact that they give the holder of the chips the opportunity to gamble. This seems akin to saying that a taxpayer who purchases a 99-year leasehold to a vacant lot in midtown Manhattan has not acquired "property" because the value of the leasehold interest is derived from the lessee's "opportunity" to build a large office building. That the chips derive value from the opportunity they afford is no reason why they are not property. A person who purchases chips receives, among other things, the casino's promise to provide a gambling opportunity. In that sense, the opportunity is no different than any other valuable and assignable contract right which we would surely recognize as property. A license is nothing more than a grant of an opportunity to the licensee to do something which he would otherwise be prohibited from doing. Nevertheless, a license is considered property. *Barry v. Barchi,* 443 U.S. 55, 64 (1979) (State racing and wagering license); *Wolfe v. United States,* 798 F.2d 1241, 1245 (9th Cir. 1986) (ICC license); *Aqua Bar & Lounge, Inc. v. United States,* 539 F.2d 935, 937-938 (3d Cir. 1976) (liquor license). Similarly, an option, which can also be characterized as

---

[1]The majority also notes that petitioner as a valued customer received other incidental services (lodging, meals, etc.). However, the markers were not given for these services and there is no evidence regarding the quantity or value of these incidental services.

nothing more than a grant of an opportunity, constitutes property. *Helvering v. San Joaquin Fruit & Investment Co.,* 297 U.S. 496, 498 (1936).

The majority concludes that property within the meaning of section 108(e)(5) includes tangible property and "may apply to some types of intangibles." It then states that "Abstract concepts of property are not useful" in deciding what is property within the contemplation of section 108(e)(5). (Majority opinion at p. 1100) The opinion then leaves us to wonder what kinds of intangible property might come within the contemplation of the statute or what concepts, abstract or otherwise, were relied upon in construing the meaning of the statute.

The majority provides no explanation of why it believes the term "property," as used in section 108(e)(5), should be more restrictive than the normal usage accorded that term and cites no legislative history to support such a conclusion. Section 108(e)(5) was added to the Internal Revenue Code by the Bankruptcy Tax Act of 1980, Pub. L. 96-589, 94 Stat. 3389, 3393. That section provides:

(5) PURCHASE-MONEY DEBT REDUCTION FOR SOLVENT DEBTOR TREATED AS PRICE REDUCTION.—If—
    (A) the debt of a purchaser of property to the seller of such property which arose out of the purchase of such property is reduced,
    (B) such reduction does not occur—
        (i) in a title 11 case, or
        (ii) when the purchaser is insolvent, and
    (C) but for this paragraph, such reduction would be treated as income as to the purchaser from the discharge of indebtedness,

then such reduction shall be treated as a purchase price adjustment.

The term "property" as used in section 108(e)(5) is not specifically defined. However, the term "property" is generally understood to be a broad concept. As the Supreme Court noted recently:

Of the aggregate rights associated with any property interest, the right of use of property is perhaps of the highest order. One court put it succinctly:

" 'Property' is more than just the physical thing—the land, the bricks, the mortar—it is also the sum of all the rights and powers incident to ownership of the physical thing. It is the tangible and the intangible. Property is composed of constituent elements and of these elements the

right to *use* the physical thing to the exclusion of others is the most essential and beneficial. Without this right all other elements would be of little value." *Passailaigue v. United States,* 224 F. Supp. 682, 686 (MD Ga. 1963) (emphasis in original). [*Dickman v. Commissioner,* 465 U.S. 330, 336 (1984). Fn. ref. omitted.]

The plain language of a statute is the primary source for any interpretation. When that language is not ambiguous, it is conclusive absent a clearly expressed legislative intent to the contrary. *Consumer Product Safety Commission v. G.T.E. Sylvania, Inc.,* 447 U.S. 102, 108 (1980). The starting point for interpreting a statutory provision is the language of the actual statute. *Watt v. Alaska,* 451 U.S. 259, 265 (1981); *Richards v. United States,* 369 U.S. 1, 9 (1962). The plain meaning of the statutory language, as enlightened by the contemporaneous legislative history, often indicates the congressional intent behind enactment of a particular statute. *Edwards v. Aguillard,* 482 U.S. 578, 594 (1987). In this particular instance, neither the statute nor the accompanying legislative history qualify or restrict the term "property." No attempt has been made to specify any limits on the scope of the term. Instead, the term is used in a broad, comprehensive manner. When Congress intends to restrict the meaning of the term "property," it certainly knows how to do so. See, for example, sec. 1031(a).[2]

In *Dickman v. Commissioner, supra,* the Supreme Court commented on the meaning of the term "property" as used in the gift tax provisions of the Internal Revenue Code. Noting that the legislative history of the Federal gift tax contained no restrictions on the term "property," the Court concluded that Congress used that term in its broadest and most comprehensive sense. *Dickman v. Commissioner, supra* pp. 334-336. The Court went on to hold that even the use of money constituted property. *Dickman v. Commissioner,*

---

[2]Sec. 1031(a), prior to amendment by the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 595-596, provided:

SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if *property* held for productive use in trade or business or for investment *(not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest)* is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment. [Emphasis added.]

*supra* p. 336. Absent any demonstrated congressional intent to limit the scope of this term, the gambling chips purchased by petitioner constitute "property" for purposes of section 108(e)(5).[3]

Section 108(e)(5) and the background giving rise to its enactment support its application to the facts in this case. Prior to enactment of section 108(e)(5), case law distinguished between true discharge of indebtedness situations which required recognition of income and purchase price adjustments. A purchase price adjustment occurred when a purchaser of property agreed to incur a debt to the seller but the debt was subsequently reduced because the value of the property was less than the agreed upon consideration. A mere purchase price adjustment does not result in discharge of indebtedness income. See *N. Sobel, Inc. v. Commissioner,* 40 B.T.A. 1263 (1939); B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts, pp. 6-39 - 6-40 (2d ed. 1989).

Section 108(e)(5) was enacted "to eliminate disagreements between the Internal Revenue Service and the debtor as to whether, in a particular case to which the provision applies, the debt reductions should be treated as discharge income or a true price adjustment." S. Rept. 96-1035 (1980), 1980-2 C.B. 620, 628. Section 108(e)(5) applies to transactions occurring after December 31, 1980. S. Rept. 1035, *supra,* 1980-2 C.B. at 622-623. Its provisions are not elective. It is obvious from the portions of petitioner's brief, quoted in the majority opinion at pages 1098 and 1099, that one of petitioner's arguments is that the value of what he received was less than the amount of debt incurred. Respondent

---

[3]The majority's statement that the chips were a substitute for cash is not completely accurate and is irrelevant for purposes of determining whether chips are property. Chips could be used for gambling purposes only; cash could not be used for that purpose but is legal tender and can be used as a universal medium of exchange. The value of the chips was dependent upon the continued operation and financial solvency of the casino, whereas cash has value apart from the solvency of the source from which it is received. Property that is used in lieu of money does not lose its status as property. Certainly precious metals or assets exchanged in sec. 1031 transactions might be said to be substitutes for cash, but they are still property other than cash for tax purposes. *Biggs v. Commissioner,* 632 F.2d 1171 (5th Cir. 1980), affg. 69 T.C. 905 (1978); *Starker v. United States,* 602 F.2d 1341, 1355 (9th Cir. 1979). We have previously held that foreign currency constitutes "property" for tax purposes. *National-Standard Co. v. Commissioner,* 80 T.C. 551 (1983), affd. 749 F.2d 369 (6th Cir. 1984). The majority's observation that chips represent a credit balance reflecting an obligation of the casino does not detract from their status as property. A corporate bond represents an obligation of the corporation, but surely no one would deny that the bond is property.

argues, and the majority finds, that the chips petitioner received were worth the full value of the debt. Thus, this case presents the very controversy that the above-quoted legislative history says Congress tried to eliminate by enacting section 108(e)(5).

For a reduction in the amount of a debt to be treated as a purchase price adjustment under section 108(e)(5), the following conditions must be met: (1) The debt must be that of a purchaser of property to the seller which arose out of the purchase of such property; (2) the taxpayer must be solvent and not in bankruptcy when the debt reduction occurs; and (3) except for section 108(e)(5), the debt reduction would otherwise have resulted in discharge of indebtedness income. Sec. 108(e)(5); B. Bittker & L. Lokken, *supra* at pp. 6-40 - 6-41; see also *Sutphin v. United States,* 14 Cl. Ct. 545, 549 (1988); *Juister v. Commissioner,* T.C. Memo. 1987-292; *DiLaura v. Commissioner,* T.C. Memo. 1987-291.

The first condition of section 108(e)(5) has been met since petitioner was the purchaser of property in the form of gambling chips and the debt arose out of these purchases.

As to the second condition of the statute, the stipulation of facts contains no specific statement regarding whether petitioner was solvent and not in bankruptcy when the debt reduction occurred. Respondent bears the burden of proof on the discharge of indebtedness issue, therefore, the absence of evidence cannot benefit respondent. However, petitioner's opening brief stated that petitioner was solvent at the time the debt was reduced and neither respondent's opening nor reply brief disputes this.[4] In any event, had petitioner been insolvent or in bankruptcy, the discharge of indebtedness would have been excluded from income under section 108(a)(1).[5]

---

[4]Given the majority's willingness to disregard stipulated facts, it could have more easily disregarded petitioner's statement on brief that he was solvent since statements in briefs are not evidence.

[5]There is nothing in the stipulated facts to establish petitioner's solvency. It could be argued that respondent has failed to prove the inapplicability of sec. 108(a)(1). Sec. 108(a)(1), prior to amendment by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2273, provided:

(a) EXCLUSION FROM GROSS INCOME.—

(1) IN GENERAL.—Gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if—

(A) the discharge occurs in a title 11 case,

(B) the discharge occurs when the taxpayer is insolvent, or

The third specific requirement of the statute, that there was discharge of indebtedness income, but for section 108(e)(5), has been met as found by the majority.

In addition to the literal statutory requirements, the legislative history indicates that section 108(e)(5) was intended to apply only if the following requirements are also met: (a) The price reduction must result from an agreement between the purchaser and the seller and not, for example, from a discharge as a result of the running of the statute of limitations on enforcement of the obligation; (b) there has been no transfer of the debt by the seller to a third party; and (c) there has been no transfer of the purchased property from the purchaser to a third party. S. Rept. 1035, *supra*, 1980-2 C.B. at 628; B. Bittker & L. Lokken, *supra* at pp. 6-40 - 6-41.

These requirements have also been met. The settlement agreement indicates that petitioner and Resorts mutually agreed to reduce the amount of indebtedness in order to amicably resolve their differences and terminate their litigation. In that litigation, Resorts alleged a number of counts and petitioner raised a variety of affirmative defenses. The settlement agreement was the result of direct negotiations between petitioner and Resorts.[6]

The second requirement set forth in the legislative history has been met. Resorts did not transfer petitioner's debt to a third party.

The third requirement has also been met. Petitioner did not transfer the property to a third party. Both parties in their briefs acknowledge that petitioner did transfer the property to Resorts in that the chips were lost to Resorts at the gambling tables. The legislative history, however, indicates that application of section 108(e)(5) is precluded only if the purchaser/taxpayer transfers the property to a "third party." Resorts was not a third party; Resorts was the seller/creditor.

Respondent's brief makes only two arguments as to why section 108(e)(5) is inapplicable to this case. Respondent first argues that section 108 does not apply to this case

---

(C) the indebtedness discharged is qualified business indebtedness.

[6]Respondent has not argued to the contrary. Indeed, in referring to the settlement in an attempt to rebut petitioner's argument that the debt was unenforceable, respondent's reply brief states: "all we have is a disputed claim that was settled."

because section 1.108(a)-1, Income Tax Regs., restricts its application to corporations or individuals in connection with property used in a trade or business and that section 1.108(a)-2, Income Tax Regs., requires that a taxpayer must file a consent form with his return to have his property adjusted. The problem with this argument is that there are no such requirements in section 108(e)(5) and the regulations relied upon by respondent clearly do not apply.

Section 1.108(a)-1, Income Tax Regs., was promulgated in 1956, over 23 years before enactment of the provisions of section 108(e)(5). The section of the regulations that respondent relies upon specifically applies to the then-existing provisions of section 108(a) dealing with a situation completely separate from that covered in section 108(e)(5). Likewise, section 1.108(a)-2, Income Tax Regs., last amended in 1967, specifically applies to the then-existing provision of section 108(a) and not to section 108(e)(5) which was enacted 13 years later. Respondent's arguments are without merit.

Respondent's second argument consists of only the following two sentences in his reply brief. "Furthermore, the liability in this case is based on the receipt of cash. A purchase price adjustment occurs when the dispute involves contract liability for the purchase of an asset." I am unable to discern any basis or rationale for this argument. Respondent stipulated to, and his brief requests, a finding of fact that property in the form of chips was received in exchange for petitioner's markers.[7]

The majority decides an issue of first impression by disregarding the plain language of the statute without any justification in the statute or legislative history. The result produced is ironic for both the Court and petitioner. The Court must decide the difficult factual issues that section 108(e)(5) was intended to eliminate while petitioner incurs a

---

[7]We have recently described a seller-financed transaction as an "amalgam of two distinct transactions. First, there is a transfer of the asset from the seller to the buyer. Then, there is a 'loan' from the seller to the purchaser of all or a portion of the purchase price." *Finkelman v. Commissioner,* T.C. Memo. 1989-72. If respondent's "cash" argument is based on the second part of this bifurcated description of a seller-financed transaction, the result would completely nullify sec. 108(e)(5) since no transactions would ever qualify for sec. 108(e)(5) relief.

huge tax liability, the magnitude of which is in direct proportion to his losses.[8]

I would dispose of this case by assuming that there was discharge of indebtedness income. I would then apply section 108(e)(5) to treat the discharge as a purchase price adjustment. This would result in no taxable income. I respectfully dissent.

CHABOT, SWIFT, WILLIAMS, and WHALEN, *JJ.*, agree with this dissent.

---

[8]While I do not agree with Judge Tannenwald's technical analysis of the discharge of indebtedness issue, the irony he points out is inescapable.