JOHN THOMAS WILSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wilson v. Commissioner
Docket No. 21468-88
United States Tax Court
T.C. Memo 1989-652; 1989 Tax Ct. Memo LEXIS 653; 58 T.C.M. (CCH) 880; T.C.M. (RIA) 89652; December 11, 1989
John Thomas Wilson, pro se. Margaret A. Satko, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1) *
Sec. 6653(b)(2)
1979
$  2,057.00
$  1,028.50
--
1981
22,138.00
11,069.00
--
1982
2,864.00
1,432.00 **
*654 Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are (1) whether petitioner had unreported income from gambling activities; (2) whether petitioner failed to include in income amounts he embezzled from his employers; (3) whether petitioner properly reported as income, unemployment compensation, wages, pension payments, and interest received; (4) whether petitioner properly claimed deductions for amounts attributable to cash shortages, state taxes paid, and employee business expenses; and (5) whether petitioner is subject to the additions to tax for fraud pursuant to section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Petitioner resided in Detroit, Michigan, at the time *655 the petition in this case was filed. From 1974 to 1983, petitioner was employed in various capacities at the Detroit Racecourse (D.R.C.) and the Hazel Park Racecourse (Hazel Park). During the years in issue, petitioner was employed by Hazel Park and D.R.C. as a terminal operator. In his capacity as a terminal operator, petitioner was responsible for selling tickets to patrons, cashing winning tickets, and accounting for the cash in his drawer. Terminal operators were required to be at their windows during the track hours of operation. At the end of each day's racing, the money in the drawer was turned over to track officials, who would count the cash and total the bets placed. If there was a shortage, the terminal operator would be required, by union agreement, to pay the amount short to the track on the following day. Petitioner's cash drawers at Hazel Park and D.R.C. had total shortages in the amounts of $ 2,700, $ 23,000, and $ 2,500, in 1979, 1981 and 1982, respectively. On May 27, 1982, petitioner repaid $ 11,000 of his 1981 shortages to the D.R.C. with moneys he received as a refund with respect to his 1981 Federal income tax return. Petitioner claimed and was allowed *656 a deduction for the same amount on his 1982 tax return. Prior to 1977, when a better at a track won a race with odds of 300 to 1 or greater that paid $ 600 or more, the track was required to report the payoff to the Internal Revenue Service (I.R.S.). The winner was required to fill out a form at the track listing his name, address, and social security number. At the end of the calendar year, the winner received a Form 1099 showing the payout as income. A copy of Form 1099 was sent to the I.R.S. As a result of this reporting requirement, a scheme evolved at the tracks known as "10 percenting." A "10 percenter" was someone who would approach an individual who had a winning ticket falling within the I.R.S. guidelines for reporting and offer to cash the ticket in exchange for 10 percent of the winnings. The "10 percenter" would then claim the payout and execute the reporting form using his own name, address, and social security number. The actual winner would thus avoid receipt of a Form 1099 showing his winnings. In 1977, a major change in the I.R.S. reporting requirements was instituted. A new form, "Withholding Form 5754, Statement by Person(s) Receiving Gambling Winnings, *657 " was required to be executed at the tracks for a payoff in excess of $ 1,000. Twenty percent of the payout was withheld for Federal income tax purposes and credited to the winner's account as a prepayment. The information provided on Form 5754, the signature and the identification number of the winner, was used by track personnel to prepare Form W-2G, "Statement of Certain Gambling Income," at the end of each calendar year. Copies of the Form W-2G were sent to the person who cashed the ticket and to the I.R.S. In 1980, D.R.C. and Hazel Park switched from manual to computerized systems and the Form 5754 became obsolete. Thereafter the tracks began to use vouchers to notify the I.R.S. of a better's winnings and the track's withholdings. The voucher disclosed the better's name, address, social security number, the window at which the transaction took place, the value of the win, the amount of Federal and state tax withheld, and the better's endorsement. As a result of the 1977 change in reporting, the "10 percenters" began offering to cash winning tickets in order to obtain refunds of the withheld 20 percent. At the end of the calendar year, the "10 percenter" would report gambling *658 winnings equal to the total amount stated on the Form W-2G he received. He would then scavenge for losing tickets, often discarded on the track floor, equal to the reported winnings and offset the winnings with the purported losses. The "10 percenter" would then claim a refund equal to the taxes withheld. During the years in issue, petitioner approached individuals and offered to cash their winning tickets for them. He signed the winning tickets and provided his name, address, and social security number for the I.R.S. withholding forms. Petitioner also had others sign his name and social security number to winning tickets in an effort to accumulate withholding credits. Wallace Triplet, a mutuel clerk at D.R.C. and Hazel Park, participated with petitioner in purchasing other persons' winning tickets, preferably in sums exceeding $ 1,000, signing petitioner's name and social security number, and thereby permitting petitioner to accumulate withholding credits. James Taylor, a clerk at D.R.C. and Hazel Park, knew petitioner for 20 years and participated with him in "splitting tickets," i.e., "10 percenting" and cashing tickets that did not require withholding. As a result of *659 his activities, petitioner received Forms W-2G showing gambling income and withholdings that were attributable to other persons' gambling. On his Federal income tax returns for 1978 through 1982, petitioner reported the gambling winnings stated on the Forms W-2G. Petitioner's reported gambling winnings increased from $ 16,393 in 1976 to $ 48,823 in 1977, to $ 65,033 in 1978, and to $ 239,159.70 in 1979. In 1981 and 1982, petitioner reported $ 226,027.40 and $ 97,405.60, respectively, as gambling winnings. Petitioner offset the gambling winnings with gambling losses that were nearly equal to or exceeded his gambling winnings. Petitioner received refund checks of $ 2,752.61 dated July 6, 1979; $ 38,177.43 dated February 13, 1981; $ 15,425.40 dated May 29, 1981; $ 27,544.30 dated May 18, 1982; and $ 222.18 dated May 28, 1982. Petitioner was convicted, pursuant to 18 U.S.C. sec. 287, of filing false claims on his 1979, 1980, and 1981 Federal income tax returns and, pursuant to section 7206(1), of filing false and fraudulent Federal tax returns for 1978 through 1981. Respondent determined that petitioner: (1) failed to include in income refunds he fraudulently *660 obtained as a "10 percenter"; (2) failed to include as income amounts he claimed as cash shortages from Hazel Park and D.R.C.; (3) failed to report wages, unemployment compensation, pension payments, and interest payments received totaling $ 3,156; and (4) is not entitled to deductions for a cash shortage of $ 23,000, state taxes paid of $ 22,444, or employee business expenses of $ 900. OPINION Deficiency Items
The language of section 61, "all income from whatever source derived," has been held to encompass within the definition of gross income all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). A gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." Rutkin v. United States, 343 U.S. 130, 137 (1952). The Supreme Court has held that earnings acquired by a taxpayer, "lawfully or unlawfully without the consensual recognition, express or *661 implied, of an obligation to repay and without restriction as to their disposition" are income that is required to be reported, even though the moneys may be required to be returned. James v. United States, 366 U.S. 213, 219 (1961). The taxpayer in such a situation has "actual command over the property taxed -- the actual benefit for which the tax is paid." 366 U.S. at 219. Application of this standard has been sustained with regard to wrongful appropriations, thereby bringing them within the grasp of section 61. 366 U.S. at 219. The initial issue for decision is whether, as respondent asserts, petitioner failed to include in income refunds of $ 7,725 in 1979, $ 48,505 in 1981, and $ 27,766 in 1982 fraudulently obtained while engaged in "10 percenting" activities. Petitioner denies he was engaged in "10 percenting" activities and asserts that the amounts he reported represented actual winnings and losses attributable to his own activities as a "closet" gambler who often expended large amounts of money on races. In connection with the criminal investigation, petitioner submitted to the United States Attorney a box of his gambling *662 tickets that purportedly substantiated his losses for the years in issue. Joseph Miller, an I.R.S. agent since 1966, analyzed a representative sampling of petitioner's losing tickets for 1978 through 1981 that were purchased at 10 or more windows for a given race. The analysis revealed 19 occasions when tickets were purchased for the same race at 10 or more windows and several occasions where tickets were purchased at 14 different windows on three separate floors for the same race. We conclude that it would have been physically impossible for petitioner to perform his job requirements while running from window to window to purchase all of the tickets covered by Miller's analysis. In any event, the losing tickets submitted do not, in total, substantiate the losses claimed by petitioner. Petitioner contends that he had others place bets from various windows for him because he believed his gambling activity was being watched. There is no evidence corroborating petitioner's testimony. It is improbable, and his credibility is impeached by his conviction of crimes involving dishonesty and specifically relating to the same factual circumstances. The other evidence is overwhelming *663 that petitioner received income from his fraudulent refund scheme. The refunds represent income taxable to petitioner in the year received. Respondent also determined that petitioner failed to report the amounts representing cash shortages, totaling $ 28,200, as embezzlement income from Hazel Park and D.R.C. The evidence presented by respondent establishes that petitioner took amounts from his cash drawers while an employee of Hazel Park and D.R.C. and wagered such funds on horse races. Petitioner presented no evidence to show that either employer knew of petitioner's "borrowings" or of any agreement during the years in issue between the employers and petitioner whereupon petitioner was to repay the "borrowed" funds. He merely claims that he lost the funds. Gambling losses, however, cannot be offset against income from sources other than gambling winnings. Section 165(d); see Zarin v. Commissioner, 92 T.C. 1084, 1096 (1989). Under these circumstances, we conclude that there was no consensual obligation to restore the misappropriated funds, and such funds are therefore *664 includable in income. In 1979, petitioner received unemployment compensation, wages, pension payments, and interest income totaling $ 2,193 that he failed to report as income. Similarly, in 1981, petitioner received unemployment compensation totaling $ 963 that he failed to report as income. Petitioner presented no evidence that such amounts should not be taxed. Respondent's determinations are thus sustained. In 1981, petitioner claimed a deduction for cash "shortages" repaid to the track in the amount of $ 23,000. Petitioner presented no evidence to substantiate this deduction. Respondent's determination is therefore sustained. Respondent disallowed petitioner's deduction for state taxes paid of $ 11,460 in 1979, $ 8,381 in 1981, and $ 3,882 in 1982. Respondent asserts that such amounts were attributable to petitioner's "10 percenting" activity and were not amounts paid by petitioner but rather represented amounts paid by the true winners. In light of our findings with respect to petitioner's "10 percenting" activity, we conclude that respondent's determination is correct. Respondent disallowed petitioner's deduction of $ 900 for employee business expenses in 1979 due *665 to lack of substantiation. Petitioner has failed to present evidence to substantiate the claimed amounts. Respondent's determination is sustained. Additions to Tax for Fraud
The 50-percent addition to tax in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Respondent has the burden of proving by clear and convincing evidence that there was an underpayment and that some part of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. *666 The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud, may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). Although understatement of income standing alone is not sufficient to prove fraud, consistent and substantial understatement of income is, by itself, strong evidence of fraud. Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Here, petitioner underreported his taxable income for each of 3 years. Petitioner underreported *667 income with respect to his involvement in two illegal schemes, one devised to avoid the payment of tax on gambling income of others and a second to secure tax refunds to which he was not entitled. Further, he embezzled funds from his employers. The evidence of fraud is clear and convincing, and petitioner is liable for additions to tax under section 6653(b). Decision will be entered for the respondent. Footnotes
*. For taxes the last date prescribed for payment of which is after December 31, 1981, sec. 6653(a) was revised and divided into sec. 6653(a)(1) and (a)(2). ** 50 percent of the interest due on $ 2,864.00.↩